IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> MICHAEL A. LIBERTY, : <br> KIERAN J. DALE, : <br> KEYSTONE V PARTNERS, L.P., : <br> KEYSTONE VENTURE MANAGEMENT : <br> HOLDINGS, INC., : <br> KEYSTONE V MANAGEMENT CO., INC., : <br> JOHN R. REGAN and : <br> PETER E. LIGETI, : <br> Defendants. : | Civil Action No. |

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges for its Complaint the following:

### SUMMARY

1.     This matter involves a fraudulent scheme to misappropriate more than $9 million from a private venture capital fund and its investors, the majority of which were public pension funds, including the City of Philadelphia Board of Pensions and Retirement, the Pennsylvania State Employees Retirement System, and the State of Connecticut Retirement Plans and Trust Funds.  Specifically, beginning in or about 1997 through in or about February 2002, defendants Michael A. Liberty, Kieran J. Dale, Keystone V Partners, L.P. ("Keystone Partners"), Keystone Venture Management Holdings, Inc. ("Keystone Holdings") and Keystone V Management Co.,

Inc. ("KVMC") (collectively "the Corporate Defendants") misappropriated more than $9 million from Keystone Venture V, LP ("Keystone V" or "the Fund"), a Philadelphia-based private venture capital fund. These defendants then concealed the misappropriation of funds by creating false and misleading financial statements that reflected the diverted assets as legitimate investments even though they knew or were reckless in not knowing that those funds had been diverted to Liberty and others associated with him. These false and misleading financial statements were then disseminated to existing and prospective limited partners of the Fund.

2.    Dale, together with defendants John R. Regan and Peter E. Ligeti, provided investment advice to the Fund through their ownership of defendants Keystone Partners, Keystone Holdings, and KVMC. Regan and Ligeti discovered evidence of Dale's misconduct in 2000, and along with Dale, and the Corporate Defendants, they entered into a settlement agreement with defendant Liberty in or around March 2001 releasing Liberty from any liability to the Fund, thereby apparently causing the Fund to give up valuable rights it had against Liberty. Defendants Regan and Ligeti failed to disclose Dale's misconduct to the limited partners of the Fund until late 2001, and did not disclose the existence of the settlement agreement until February 2002. While failing to disclose this material information, the defendants issued capital calls as late as February 2001, and continued to solicit and sell limited partnership interests until April 2001.

3.    As a result of the conduct described in this Complaint, defendant Liberty: (i) violated, and unless restrained and enjoined by this Court will continue to violate Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder, or in the alternative, defendant Liberty aided and abetted, and

unless restrained and enjoined by this Court will continue to aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (ii) aided and abetted, and unless restrained and enjoined by this Court will continue to aid and abet violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

4.     As a result of the conduct described in this Complaint, defendants Dale, Keystone Partners, Keystone Holdings, and KVMC violated and, unless restrained and enjoined by this Court, will continue to violate Section 17(a) of the Securities Act , 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

5.     As a result of the conduct described in this Complaint, Defendants Regan and Ligeti have violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2) and Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Sections 209(d) and 209(e) of the Advisers Act, 15 U.S.C. §§ 80b-9(d) and 80b-9(e), to enjoin such acts, transactions, practices and courses of business, obtain disgorgement and civil penalties, and for other appropriate relief.

7.      This court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and

Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

8.      Certain of the acts, practices and courses of business constituting the violations

alleged herein occurred within the Eastern District of Pennsylvania and elsewhere, and were

effected, directly or indirectly, by making use of the means and instruments of transportation or

communication in interstate commerce, or the means and instrumentalities of interstate

commerce, or the mails, or the facilities of a national securities exchange.

### DEFENDANTS

9.      **Michael A. Liberty**, age 45, is a resident of Gray, Maine, and is a businessman

who has been associated with numerous companies.

10.     **Kieran J. Dale**, age 49, resides in Downingtown, Pennsylvania.  He became

associated with the predecessors of the Corporate Defendants in 1988.  During all times material

to the events described in this Complaint, he was a Managing Director of Keystone Partners, and

provided investment advice to the Fund.

11.     **Keystone V Partners, L.P.**  ("Keystone Partners") is a Pennsylvania limited

partnership established in or about December 1997.  It is the general partner of the Fund.  During

all times material to the events described in this Complaint, defendants Dale, Regan and Ligeti

(collectively the "Managing Directors") were the three limited partners of Keystone Partners,

each owning one-third.  Profits, gains, credits and losses of the Fund were allocated equally

among the Managing Directors.

12.     **Keystone Venture Management Holdings, Inc.** ("Keystone Holdings") has been

the General Partner of Keystone Partners since 2001.  At all relevant times it was the

management company for Keystone V. Keystone V paid fees to Keystone Holdings for investment advice. During the relevant time period, Dale, Regan and Ligeti each owned one-third of Keystone Holdings.

13.    **Keystone V Management Co., Inc.** ("KVMC") is a Pennsylvania Subchapter S corporation incorporated in December 1997. KVMC was the general partner of Keystone Partners and an investment adviser to Keystone V before Keystone Holdings. During the relevant time period, Dale, Regan and Ligeti each owned one-third of Keystone Holdings.

14.    **John R. Regan**, age 46, lives in Clarendon Hills, Illinois. He joined the predecessor of the Corporate Defendants in 1995. At all times material to the events described in this Complaint, he was a Managing Director of Keystone Partners and provided investment advice to the Fund through the Corporate Defendants.

15.    **Peter E. Ligeti**, age 50, lives in Princeton Junction, New Jersey. He joined the predecessor of the Corporate Defendants in 1988. At all times material to the events described in this Complaint, he was a Managing Director of Keystone Partners and provided investment advice to the Fund through the Corporate Defendants.

<strong><u>RELATED ENTITY</u></strong>

16.    **Keystone Venture V, LP** ("Keystone V" or "the Fund") was established by defendants Dale, Regan and Ligeti in 1997 as a limited partnership for the purpose of investing in high-growth information technology, consumer and outsourcing companies. Keystone V offered up to $100 million in limited partnership interests. The major limited partners were state and local retirement systems and pension plans, including the State of Connecticut Retirement Plans and Trust Funds, the Pennsylvania State Employees Retirement System, and the City of Philadelphia Board of Pensions and Retirement.

## FACTS

### Background

17.    At all times material hereto, defendants Dale, Regan and Ligeti acted by and through the Corporate Defendants.

18.    In 1982, the first of the series of Keystone limited partnership funds (hereinafter referred to as the "Keystone Funds") was established for the purpose of pooling limited partner funds to invest in suitable companies, also referred to as "portfolio companies." Ligeti and Dale joined the Keystone Funds in 1988. In 1993 they established Keystone Venture IV, L.P. and raised $31 million from institutional investors. Regan joined the Keystone Funds in 1995.

19.    At all times relevant hereto, Dale, Regan and Ligeti, as Managing Directors of Keystone Partners, made and monitored the Keystone Funds' portfolio investments. Each was responsible for locating suitable portfolio companies in which to invest the funds of the limited partners, making investment recommendations to the other Managing Directors, keeping the other Managing Directors advised about portfolio company performance and providing the appropriate financial and other information to the Fund's accounting staff for purposes of preparing financial statements for dissemination to the limited partners.

20.    In 1997, Dale, Regan and Ligeti established the Keystone V limited partnership. Keystone V offered $100 million in limited partnership interests for investment in high-growth information technology, consumer and outsourcing companies. Pursuant to the terms of the Fund's Partnership Agreement, an Advisory Board, comprised of the Fund's largest limited partners, was established to review and oversee the Fund's investment policies and practices, including all matters involving actual or potential conflicts of interest.

21.    Each prospective limited partner was provided with two documents setting forth the purpose and operation of the Fund--the Private Placement Memorandum and a Partnership Agreement. The Private Placement Memorandum provided information about the investment objectives of Keystone V and the backgrounds of the Managing Directors, among other things. The Partnership Agreement set forth the rights and obligations of the parties, including the limited partners and the general partner. The Private Placement Memorandum emphasized the importance of Dale, Regan and Ligeti to the success of the Fund and cautioned that the death, disability or withdrawal of any of them could adversely affect the operations or success of the Fund.

22.    The Fund's Partnership Agreement set forth the terms of capital investment:

- "Committed Capital" was the total amount of money that a limited partner agreed to invest in the Fund. The Committed Capital was required to be paid into the Fund over a period of ten years;

- "Initial Contribution" was the portion of the Committed Capital that a limited partner was required to pay in cash upon subscription;

- "Permitted Capital Calls" obligated limited partners to contribute in cash additional amounts up to their respective Committed Capital whenever the general partner deemed such additional contributions necessary to consummate portfolio investments, among other things;

- "Contributed Capital" was the sum of a limited partner's actual contributions, whether in the form of the Initial Contribution or Capital Call;

- "Defaulting Partner" was a limited partner that failed to make prompt payments of its Committed Capital. A Defaulting Partner was permitted to solicit *bona fide*

7

all-cash written offers for its entire interest in the Fund, subject to a right of first refusal of the other limited partners.

23.    The obligation of the limited partners to comply with Permitted Capital Calls was limited by other provisions of the Partnership Agreement. For example, limited partners were allowed to stop making payments, withdraw or terminate the Partnership Agreement under certain circumstances. These included gross negligence or willful misconduct by a general partner, or a decline in value of at least 50% of the Committed Capital as reflected on the Fund's financial statements.

24.    As Managing Directors of Keystone Partners, defendants Dale, Regan and Ligeti handled the day-to-day management of the Fund. The Partnership Agreement and a written Code of Ethics governed their overall management and operation of the Fund. The Advisory Board reviewed the Fund's investment policies and practices, including all matters involving actual or potential conflicts of interest.

25.    Keystone Partners, as general partner of the Fund, was entitled to 20% of the Fund's profits and to a quarterly management fee ranging from 1.5% to 2.5% of the total Committed Capital.

26.    By the end of 1999, Keystone V had raised approximately $101 million in Committed Capital from approximately 35 investors and had received approximately $94 million in Contributed Capital. Dale had solicited nearly all of the investors. By that time, two companies controlled by Liberty had also become limited partners in the Fund.

27.    For the year 2000, the Fund reported to its limited partners that approximately $85 million of the total Contributed Capital had been invested in 22 portfolio companies. However, Dale and Liberty, who by that time was receiving the Fund's reports as representative of the two

8

limited partners he controlled, knew or were reckless in not knowing that this information was false because they had diverted millions of dollars to Liberty and others and knew that the Fund's monies had not been invested as represented.

**The Dale-Liberty Relationship**

28.    Dale met Liberty in or about 1996. Liberty was a self-described entrepreneur based in Maine, who claimed to do business with Wal-Mart. He also had a business relationship with a Boston-based businessman who loaned money to him for a variety of business ventures. Liberty recommended to Dale a number of potential portfolio companies for investment by the Keystone Funds, some of which he controlled or in which he had an interest.

29.    In June 1999, Liberty became a representative of one of Keystone V's largest putative investors when an entity controlled by Liberty, Cambridge Associates Holdings Corporation ("CAHC"), subscribed for $20 million in Committed Capital. The Initial Contribution amount in the subscription agreement, which Liberty signed on behalf of CAHC, was designated "TBD." This designation violated the terms of the Partnership Agreement which required that a potential investor specify the amount of the Initial Contribution and pay that amount to the Fund to become a limited partner.

30.    In September 1999, another Liberty-controlled entity, Cambridge Key Investments ("CKI"), subscribed for $5 million in Committed Capital in Keystone V, but the amount of the Initial Contribution again was not specified in the subscription agreement, which Liberty signed. Unknown to Regan or Ligeti, CAHC and CKI made little if any Initial Contribution as required under the Partnership Agreement, and neither ever made any significant payment of capital to the Fund. Despite this, both CAHC and CKI became limited partners of the Fund. Rather than pay any money to Keystone V, between approximately 1999 and 2000,

CAHC and CKI sold or transferred most of their defaulted Capital Commitment to new investors, who then paid the outstanding commitments to the Fund.

31.    Dale was fully aware of these defaults and the subsequent sales of outstanding commitments but he concealed this information from defendants Regan and Ligeti and the other limited partners of the Fund. The limited partners were entitled to know about the defaults of CAHC and CKI because under the terms of the Partnership Agreement, they had a right of first refusal to purchase defaulted interests. Another result of Dale's concealment of this information was the appointment to the Advisory Board of Liberty, as the representative of CAHC, supposedly one of the Fund's largest investors.

**The Fraudulent Scheme**

32.    Almost from the inception of Keystone V in 1997, Dale and Liberty were engaged in a fraudulent scheme to divert the Fund's money to Liberty and others associated with him under the guise of investments in portfolio companies. Dale directed the disbursement of Keystone V's funds for the ostensible purpose of investing in various portfolio companies, including many which Liberty owned and controlled, but instead wired the funds to Liberty and third parties either directly or through Liberty's lawyers. Dale distributed the monies to Liberty and his associates in conformity with Liberty's instructions. Dale then caused these disbursements to be falsely recorded and reported to the limited partners as investments of the full amounts in portfolio companies, thereby overstating the nature and amount of the investments and the Fund's portfolio while failing to disclose that Liberty had an interest in many of these portfolio companies.

33.    Between late 1997 and 2000, Dale, at Liberty's direction, disbursed close to $27 million of Fund assets, more than a quarter of the Fund's total Committed Capital, to companies

that Liberty owned, controlled, had an interest in, or recommended. During this time period, through a series of fraudulent transactions, and without the knowledge, authorization or consent of Regan and Ligeti, Dale and Liberty diverted more than $9 million of the $27 million to Liberty, his associates and others. Of the $9 million in diverted Fund monies, approximately $4.5 million went to benefit Liberty directly. The balance of the $9 million went to other third parties. The remaining $18 million was apparently lost when the businesses in which the Fund had invested failed.

34.    When investing Fund assets in connection with Liberty-related transactions, Dale generally did not invest those assets directly into portfolio companies as was typical in the Fund's non-Liberty related investments. Instead, in the Liberty-related transactions Dale, at Liberty's direction, invested the Fund's assets in limited liability companies ("LLC's") established by Liberty and at least partially owned and controlled by Liberty. By doing so, Liberty and Dale were able to divert millions of dollars under the guise of portfolio investments.

35.    As a result of Dale's deception, the quarterly financial statements disseminated to the Fund's limited partners were false and misleading. Those fraudulent statements were used to induce new investors to become limited partners in the Fund, and to solicit additional investments from existing limited partners through Permitted Capital Calls.

36.    As a representative of CAHC and CKI, Liberty received the Fund's financial statements and knew they falsely represented investments in the entities identified below. Although Liberty, who received millions of dollars as a result of these fraudulent transactions, knew that these financial statements were false and misleading, he never disclosed that information to the Fund or the limited partners.

**The Fraudulent Transactions and Diversion of Funds**

### BLT, LLC

37.    A particularly egregious example of the fraud perpetrated by Dale and Liberty involved more than $7 million of Keystone V money that Dale purportedly invested in an entity known as BLT, LLC, a company Liberty had formed and co-owned with his Boston-based business associate.  Dale, at Liberty's direction, used a series of sham transactions to divert most of that $7 million to Liberty, third parties associated with him, and others.  At least $2.7 million of the $7 million went directly to benefit Liberty and his family, either through direct cash payments, the satisfaction of debt or the payment of expenses of one of the many business enterprises which Liberty owns or in which he has an interest.  Most of the remainder of the $7 million was diverted at Liberty's instructions to third parties, while less than $1 million was invested.

38.    Dale concealed the fraudulent transactions by causing the Fund's financial statements to falsely reflect that Keystone V had invested approximately $7 million in three entities comprising BLT, a company Liberty had established to purchase shares or ownership interests in three individual LLC's that he had created: BTC, LLC, a holding company through which Liberty owned shares of Biddeford Textiles Corporation ("Biddeford"); Legal Seafoods Gourmet Foods, LLC ("Legal"); and Pasticerria Torino USA, LLC ("Torino").

39.    In reality, at Liberty's direction, Dale caused the Fund to wire most of that money to Liberty's lawyers at a firm located in Portland, Maine ("Maine law firm"), which then disbursed the funds in accordance with Liberty's instructions.  Despite the fact that he knew that the money was coming from Keystone V for investment in the portfolio companies that comprised BLT, Liberty instructed the Maine law firm to disburse more than $6 million directly

to or for his own benefit and the benefit of related individuals and entities. Liberty and Dale
knew that this misuse of millions of dollars of Fund money was contrary to what the investors
were told through the Fund's financial statements.

40.    Dale actively concealed this diversion of Fund assets. The Fund's quarterly
report for December 31, 1999, prepared from information Dale provided to the Fund's
accounting staff, falsely represented that the Fund had invested approximately $2.4 million in
Biddeford, $1.7 million in Legal and $1.9 million in Torino. In the report for the quarter ended
June 30, 2000, Keystone V falsely represented a total investment of more than $7 million in
Biddeford, Legal and Torino. In reality, out of the more than $7 million in disbursements made
by Dale ostensibly for investments in these entities, at most only $875,000 may have been paid
to Legal and Torino, and the Fund never received documentation for any such investments. No
Fund money was ever invested in Biddeford.

### St. George Crystal

41.    In another sham transaction that resulted in a significant loss to the Fund, in June
1999, at Liberty's direction, Dale caused the Fund to wire $2 million to the personal bank
account of a Liberty employee for the ostensible purpose of investing in St. George Crystal, a
producer of lead crystal. Liberty had recommended to Dale that the Fund invest in St. George
Crystal. Liberty had invested in this company through Cambridge Crystal, LLC, an entity he had
established to hold St. George Crystal stock.

42.    None of the $2 million was invested in St. George Crystal. Instead, the day after
he had wired the funds to the Liberty employee, Dale instructed him to wire $1,150,000 to a
bank to satisfy a loan it had previously made to a Keystone IV portfolio company. Liberty and

Keystone IV had guaranteed that loan in the approximate respective amounts of $200,000 and $850,000.

43.    By diverting the funds in this manner, Liberty was relieved of his guarantee, as was Keystone IV. However, by using Keystone V funds to pay the obligation of a predecessor fund, and by not disclosing that information to the Fund, Dale violated the Keystone V Partnership Agreement and defrauded the Fund investors.

44.    The Liberty employee used $100,000 of the remaining funds to pay expenses of one of Liberty's employees. Dale instructed the employee to wire the remaining $750,000 back to Keystone V.

45.    In or about July 1999, Dale instructed Keystone V to wire another $2 million directly to St. George Crystal's bank account. St. George Crystal then issued stock to Cambridge Crystal, LLC. Dale caused the Fund to record a total investment of $3 million in St. George Crystal, when in fact both he and Liberty knew that Keystone V had invested only $2 million in Liberty's holding company, Cambridge Crystal, LLC.

46.    Dale caused the financial statements issued to falsely reflect the investment in St. George Crystal, and neither he nor Liberty ever disclosed that more than $1 million had been diverted for undisclosed and unauthorized purposes that provided no benefit to the limited partners of Keystone V.

**Café Britt**

47.    In December 1997, Dale agreed with Liberty to invest Keystone V money in Café Britt, LLC, a joint venture between Groupo Café Britt and Liberty's CAHC. At Liberty's direction, Dale disbursed a total of $2,124,406 for purported investment in Café Britt. However, again at Liberty's direction, Dale diverted approximately $700,000 of this money to Liberty and

his wife to purchase their purported interests in Café Britt. Keystone V never received documentation to support the investment reflected on its financial statements. As with the other fraudulent transactions described in this Complaint, Liberty knew that his receipt of Keystone V money was never disclosed.

### Envisionet

48.    Keystone V's financial statements as of 2001 reflect that since August 1999, it had invested a total of $6,210,000 in Envisionet Computer Services, Inc., a privately-held provider of technical support and customer care services for the internet and network related products. Liberty had recommended this investment to Dale, who then caused the Fund to disburse these monies. However, Dale caused Keystone V's books and records and financial statements to falsely reflect a total investment of $6,859,000 in Envisionet despite the fact that, at Liberty's direction, he had instructed the Maine law firm to disburse $649,000 to Liberty and third parties associated with him. In June 2001, Envisionet filed for Chapter 11 bankruptcy, and Keystone V ultimately wrote off its entire investment.

### Geosphere

49.    Between June 1998 and February 2001, Keystone V disbursed $5,042,575 for investment in Geosphere Emergency Response Systems, Inc., a private company engaged in the development of emergency management software systems. All of these payments went directly to Geosphere. However, in March 1999, Dale, in accordance with Liberty's instructions, directed Keystone V to sell 74,350 shares of its Geosphere stock to Emergency Software, LLC, a Liberty-controlled entity, for $200,000. There is no record that Emergency Software or Liberty ever paid for these shares and the Fund's financial statements do not reflect this sale.

### Bali Hai

50.    In late 1999, an investor sought to purchase a Keystone V limited partnership interest with an Initial Contribution of $250,000. Dale, at Liberty's instruction and without the knowledge or authorization of the investors or of Regan or Ligeti, diverted the money to an entity known as Bali Hai, a company in which Liberty had an interest. Regan and Ligeti had previously rejected Bali Hai as a Fund investment. Dale directed the investor to send the money intended for investment in Keystone V directly to the Maine law firm, and then directed the Maine law firm to disburse the money to Bali Hai.

51.    The investor contacted Keystone V in 2000 to ask why he had not received the appropriate tax forms. The accounting staff at Keystone V could find no record of his investment. Believing it to be an oversight, the accounting staff prepared a subscription agreement and the appropriate tax form to reflect a $250,000 investment in the Fund, even though the Fund had never received that money. In order to account for this investment, Dale instructed the Fund to "sell" one of CAHC's limited partnership interests to the investor, thereby reducing CAHC's Capital Commitment by $250,000. Dale never disclosed the facts of this transaction to the Fund, Regan or Ligeti.

### The Discovery of Dale's Misconduct and the Internal Audit

52.    Beginning in or about the middle of 2000, the problems resulting from Dale's fraudulent conduct gradually began to emerge. At that time, an outside accountant who did work for the Fund (referred to hereinafter as "JK") discovered some irregularities and missing documentation regarding the Envisionet and Bali Hai investments. He had determined that Dale had diverted to third parties $649,000 intended for investment in Envisionet and that the

$250,000 intended for investment in Keystone V had been diverted to Bali Hai. JK alerted Regan and Ligeti who then directed him to examine all of the Keystone V investments.

53.    JK was unable to find documentation for many of the Liberty-related investments, such as those described above. In addition, he was unable to determine the identity of the portfolio companies or account for many of the disbursements made in 1998 and 1999. Although JK spoke with Dale and some of the portfolio companies that purportedly received funds, he was still not able to resolve the problems. He informed Regan and Ligeti who instructed him to continue to investigate the transactions.

54.    JK discovered that there were no stock certificates for the Fund's investments in Biddeford, Legal, Torino, Envisionet and St. George Crystal, and that payments described as investments in Geosphere, Biddeford, Legal and Torino had actually been disbursed to third parties. He also discovered and was unable to reconcile the $1.25 million discrepancy in the St. George Crystal transaction. JK outlined his findings in spreadsheets and memos provided to Regan and Ligeti in the fall of 2000. It was also determined that CAHC and CKI were in default of their capital obligations in the total amount of $5 million. When confronted, Dale failed to satisfactorily explain the questionable transactions.

55.    Regan and Ligeti then terminated Dale's ability to wire or otherwise disburse Keystone V funds. As a result, Dale was no longer able to divert funds to Liberty or others. However, Regan and Ligeti permitted Dale to remain as a Managing Director and to solicit new investors to purchase CAHC's and CKI's defaulted limited partnership interests. The defaulted capital calls were discussed during a January 31, 2001 meeting of the Advisory Board attended by Dale, Regan and Ligeti, but not Liberty. However, at no time during that meeting did Dale, Regan or Ligeti disclose to the Advisory Board, which was comprised of the major limited

partners, the improper transactions or diversion of Fund assets in which Dale and Liberty were involved, or the negotiation of a settlement agreement with Liberty.

**The Settlement Agreement**

56.    In December 2000, the Fund was facing a financial crisis and the need to sell the defaulted partnership interests was urgent. The Fund was experiencing serious cash flow problems and it was in danger of defaulting on its line of credit with one of its lenders. Outside counsel advised Regan and Ligeti to consider formally declaring both CAHC and CKI in default so that their interests could be sold to raise money. In August 2000, Keystone V had in fact notified Liberty that CAHC and CKI were in default under the Partnership Agreement, but Liberty failed to cure the defaults. Rather than press the matter, in late 2000, Regan and Ligeti began to negotiate an agreement with Liberty to resolve outstanding issues, including the unresolved questions about the Fund's investments in Liberty-related entities. Liberty refused to allow the sale of the defaulted interests without such an agreement.

57.    In violation of their fiduciary duties to the Fund, Dale, Regan and Ligeti caused the Fund to enter into an agreement with Liberty releasing Liberty and others from any and all claims the Fund had against them. In exchange, the Fund received assets of questionable value.

58.    Despite the disturbing findings regarding the Dale-Liberty transactions, Regan and Ligeti directed Dale to negotiate an agreement with Liberty to resolve the outstanding issues of the improper payments, the questionable investments for which no documentation had been received, and the defaulted capital commitments. On March 29, 2001, Keystone V entered into a settlement agreement and mutual release agreement ("Settlement Agreement") with Liberty and Liberty-related individuals and entities, including those who had received Keystone V monies as part of the fraudulent transactions. Under the terms of the Settlement Agreement:

- Keystone V gave Liberty and the others complete releases from liability, thereby precluding the Fund from ever suing Liberty and his associates.

- Legal and Torino issued promissory notes for the benefit of Keystone V to repay the funds Dale and Liberty had diverted to third parties that were supposed to have been invested in Legal and Torino. Legal and Torino never made good on this debt.

- Liberty agreed to verify the Fund's ownership interests in Legal and Torino.

- The Fund was to receive $1 million of Envisionet stock in exchange for crediting CAHC with a $1 million capital contribution and allowing CAHC to remain a limited partner of Keystone V. As a result, CAHC retained a $1 million capital account that was in compliance and no longer in default.

- CAHC transferred most of its defaulted capital commitment to CKI, which resulted in CKI having a defaulted capital commitment of approximately $4.5 million.

- Liberty was allowed to sell part of the defaulted partnership interests of CKI so as to bring its capital accounts into compliance and reduce his share.

- Keystone V agreed to assign to Liberty the Fund's right to the $649,000 that Dale had diverted to third parties in connection with the Envisionet investment.

- Keystone agreed to accept additional shares of St. George Crystal common stock.

59.     Under the terms of the Settlement Agreement, Liberty was supposed to provide to Keystone V assets valued at approximately $7 million, the amount which the Fund believed Liberty owed. However, JK concluded that the value of the assets Liberty agreed to provide as consideration for the Settlement Agreement was overstated by more than 50%.

60.     Despite this information, Dale, Ligeti and Regan, in breach of their fiduciary duties to the Fund, executed the Settlement Agreement on or about March 29, 2001, without ever

informing the limited partners or the Advisory Board of the underlying frauds, the negotiations, or the execution of the Settlement Agreement.

**The Solicitation of New Investors Using False and Misleading Information**

61.     In late 2000, while negotiating the Settlement Agreement with Liberty, and with the knowledge of Dale's misconduct, Regan and Ligeti appointed Dale to solicit new investors to purchase CKI's defaulted partnership interests. Throughout February 2001, while the negotiations were continuing with Liberty, Dale identified and solicited three potential purchasers of the defaulted interests, two of which agreed to purchase them. Those investors were the Melrose Retirement System ("Melrose") and the Middlesex Retirement System ("Middlesex"), both municipalities located in Massachusetts.

62.     Dale made presentations to the boards of Melrose and Middlesex in February 2001 and provided them with written materials and financial statements, including the Fund's fourth quarter 2000 unaudited financials that Dale knew misrepresented the Fund's financial condition and investments. At no time did defendants Dale, Regan or Ligeti disclose the pending settlement negotiations with Liberty, Dale's diversion of Fund money, or the issues surrounding the Fund's investments in the Liberty-related transactions. That same month Melrose and Middlesex decided to invest in Keystone V.

63.     The purchase agreements for the sale of CKI's defaulted interests were executed on April 3, 2001, just a few days after the execution of the Settlement Agreement. Between April 3, 2001 and June 21, 2001, Melrose and Middlesex paid the Fund a total of $4,790,000. Despite the requirements of the Partnership Agreement, the defaulted interests were never offered to the existing Keystone V limited partners before sale to a third party. Liberty

continued to maintain an interest in the fund through CKI which retained a limited partnership interest in the Fund.

64.    The same false and misleading financial statements which were affirmatively wrong, and which omitted to state material facts, and failed to disclose the frauds or the Settlement Agreement, were used in the offer and sale of partnership interests to, and the purchase of partnership interests by, Middlesex and Melrose.

**Capital Calls Using False and Misleading Information**

65.    Between approximately January 2000 and February 23, 2001, the Fund, through Dale, Regan and Ligeti, issued several Permitted Capital Calls. To resolve the cash flow crisis confronting Keystone V, in late January and late February 2001, Dale, Regan and Ligeti issued two capital calls to the limited partners totaling approximately $2 million. The limited partners paid the last of these two capital calls between March 2001 and May 2001. At the time they issued these capital calls, Dale, Regan and Ligeti failed to disclose the misconduct of Dale and Liberty, or the settlement negotiations with Liberty.

66.    Dale, Regan and Ligeti asked the limited partners to respond to the capital calls in 2000 and 2001 despite the fact that the limited partners had been given the fraudulent financial statements misrepresenting the Fund's investments and their value, but had not been told of either the various aspects of the frauds which had by then been uncovered or the existence of the Settlement Agreement.

**Disclosure of the Fraud and the Settlement Agreement**

67.    After the Settlement Agreement was completed, Regan and Ligeti continued to investigate the Dale-Liberty transactions and consult with outside counsel. Although under the terms of the Settlement Agreement, Liberty and others had agreed to provide documentation of

Keystone V's ownership interests in the various portfolio companies, they did not do so. JK was not able to reconcile Keystone V's books and records. In or about April 2001, Regan and Ligeti retained an outside forensic accountant to assist JK and to independently conduct an analysis of the questionable transactions. In or about November 2001, the forensic accountant essentially confirmed what JK had already uncovered and concluded.

68.    In late 2001, outside counsel concluded that immediate disclosure to the Fund's limited partners was necessary. In a formal presentation to the Advisory Board in February 2002, Regan and Ligeti for the first time disclosed details of Dale's conduct, the Liberty-related transactions, the diversion of funds, and the Settlement Agreement.

69.    Dale resigned as a Keystone employee and withdrew as a partner effective December 31, 2001. During the course of the scheme, Dale received approximately $1,365,700 in management fees and other compensation from the Fund.

### FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

70.    Paragraphs 1 through 69 are realleged and incorporated herein by reference.

71.    From approximately December 1997 through at least April 2001, as a result of the conduct alleged herein, defendants Dale, Liberty, Keystone Holdings, KVMC, and Keystone Partners, in the offer or sale or in connection with the purchase or sale of securities, directly or indirectly, by the use of the means and instruments of transportation and communication in interstate commerce, or the means and instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, and made, untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in the

22

light of the circumstances under which they were made, not misleading; and (c) engaged in acts, transactions, practices and courses of business which operated as a fraud or deceit upon offerees, purchasers and prospective purchasers of securities.

72.    By reason of the foregoing, defendants Dale, Liberty, Keystone Holdings, KVMC and Keystone Partners have directly or indirectly violated Section 17(a) of the Securities Act, 15 U.S.C. §77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

73.    Paragraphs 1 through 72 are realleged and incorporated herein by reference.

74.    Defendant Dale has, by engaging in the conduct set forth above, directly or indirectly violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

75.    Liberty knew or was reckless in not knowing, that Dale's conduct was improper, and Liberty knowingly and substantially assisted Dale in directly or indirectly violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

76.    As a result of the conduct described above, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Liberty aided and abetted Dale's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## THIRD CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

77.    Paragraphs 1 through 76 are realleged and incorporated herein by reference.

78.    During the period set forth above, defendants Dale, Keystone Holdings, KVMC, and Keystone Partners, directly and indirectly, by use of the mails and the means and instrumentalities of interstate commerce and while acting as investment advisers: (a) employed devices, schemes and artifices to defraud advisory clients and prospective clients; and (b) engaged in transactions, practices and courses of business which operated as a fraud and deceit upon such clients and prospective clients.

79.    By reason of the foregoing, defendants Dale, Keystone Holdings, KVMC and Keystone Partners violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

80.    Paragraphs 1 through 79 are realleged and incorporated herein by reference.

81.    By engaging in the conduct set forth above, defendants Dale, Keystone Holdings, KVMC, and Keystone Partners, directly and indirectly, violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

82.    Liberty knowingly provided substantial assistance to those defendants in connection with their violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

83.    By reason of the foregoing, defendant Liberty aided and abetted the violations of Sections 206(1) and 206(2) of the Advisers Act described above.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act

84.    Paragraphs 1 through 83 are realleged and incorporated herein by reference.

85.    From approximately late 2000 through April 2001, as a result of the conduct alleged herein, defendants Regan and Ligeti, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

86.    By reason of the foregoing, defendants Regan and Ligeti violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## SIXTH CLAIM FOR RELIEF

### Violation of Section 206(2) of the Advisers Act

87.    Paragraphs 1 through 86 are realleged and incorporated herein by reference.

88.    During the period from approximately late 2001 through February 2002, defendants Regan and Ligeti directly and indirectly, by use of the mails and the means and instrumentalities of interstate commerce and while acting as investment advisers, engaged in transactions, practices and courses of business which operated as a fraud and deceit upon their clients and prospective clients.

89.    By reason of the foregoing, defendants Regan and Ligeti violated Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

**WHEREFORE**, the Commission respectfully requests that this Court:

**I.**

Issue an injunction permanently restraining and enjoining defendants Dale, Liberty, Keystone Holdings, KVMC and Keystone Partners from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

**II.**

Issue an injunction permanently restraining and enjoining defendants Dale, Keystone Holdings, KVMC and Keystone Partners from violating Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

**III.**

Issue an injunction permanently restraining and enjoining defendant Liberty from aiding and abetting violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder, and Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

**IV.**

Issue an injunction permanently restraining and enjoining defendants Regan and Ligeti from violating Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a), and Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

**V.**

Order defendants Dale, Liberty, Regan and Ligeti to disgorge all ill-gotten gains, including, but not limited to, salaries, bonuses and commissions, that they derived from the activities set forth in this Complaint, together with prejudgment interest.

**VI.**

Order defendants Dale, Liberty, Regan and Ligeti to pay civil penalties, pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21d(3) of the Exchange Act, 15 U.S.C. § 78u(d) and/or Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), as a result of the violations set forth herein.

**VII.**

Order such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Amy Greer, PA Bar No. 55950
Kingdon Kase, PA Bar No. 37952
David S. Horowitz, PA Bar No. 19781
Deborah E. Siegel

Attorneys for Plaintiff:

U. S. Securities and Exchange Commission
701 Market Street, Suite 2000
Philadelphia, PA  19106
215-597-3100

Dated:  March 8, 2006