# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br><br> Plaintiff, : <br><br> v. : <br><br> MICHAEL A. LIBERTY, : <br> KIERAN J. DALE, : <br> KEYSTONE V PARTNERS, L.P., : <br> KEYSTONE VENTURE MANAGEMENT : <br> HOLDINGS, INC., : <br> KEYSTONE V MANAGEMENT CO., INC., : <br> JOHN R. REGAN, and : <br> PETER E. LIGETI, : <br> Defendants. : | CIVIL ACTION <br><br> Case No.: 06-1030-JD <br><br> **Jury Trial Demanded** |

## ANSWER

Defendant, Michael A. Liberty ("Liberty"), by and through the undersigned attorneys, hereby answers the Complaint filed by Plaintiff, Securities and Exchange Commission ("SEC" or "Plaintiff") as follows:

## SUMMARY

1.  Denied. By way of further answer, Liberty specifically denies any involvement in, or knowledge of, the allegedly fraudulent scheme devised by Defendant Dale and covered up by Defendants Regan and Ligeti. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 1 of the Complaint, and the said averments are therefore denied.

2.  Denied. Liberty denies that Keystone had any "valuable rights" against him to give up. After a reasonable investigation, Liberty is without knowledge or information sufficient

to form a belief as to the truth of the remaining averments contained in Paragraph 2 of the Complaint, and the said averments are therefore denied.

3.  Denied as a conclusion of law.

4.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 4 of the Complaint, and the said averments are therefore denied.

5.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 5 of the Complaint, and the said averments are therefore denied.

## JURISDICTION AND VENUE

6.  Denied as a conclusion of law.

7.  Denied as a conclusion of law.

8.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 8 of the Complaint, and the said averments are therefore denied.

## DEFENDANTS

9.  Admitted.

10.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 10 of the Complaint, and the said averments are therefore denied.

11.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 11 of the Complaint, and the said averments are therefore denied.

12.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 12 of the Complaint, and the said averments are therefore denied.

13.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 13 of the Complaint, and the said averments are therefore denied.

14.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 14 of the Complaint, and the said averments are therefore denied.

15.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 15 of the Complaint, and the said averments are therefore denied.

## **RELATED ENTITY**

16.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 16 of the Complaint, and the said averments are therefore denied.

## FACTS

17.    After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 17 of the Complaint, and the said averments are therefore denied.

18.    After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 18 of the Complaint, and the said averments are therefore denied.

19.    After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 19 of the Complaint, and the said averments are therefore denied.

20.    Denied.  By way of further answer, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 20 of the Complaint, and the said averments are therefore denied.

21.    Admitted in part and denied in part.  By way of further answer, Liberty admits only that the Private Placement Memorandum and the Partnership Agreement were provided to the limited partner entities with which he was affiliated.  Further, these documents are in writing and speak for themselves; Liberty denies any attempt to characterize their contents.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 21 of the Complaint, and the said averments are therefore denied.

22.     Denied. By way of further answer, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents.

23.     Denied. By way of further answer, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents.

24.     Admitted in part and denied in part. By way of further answer, Liberty admits only that the Defendants Dale, Regan, and Ligeti were Managing Directors of Keystone Partners. Further, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents. The remaining averments of Paragraph 24 are denied.

25.     Denied. By way of further answer, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents.

26.     Admitted in part and denied in part. By way of further answer, Liberty admits only that two companies he and others were associated with, Cambridge Associates Holding Corporation ("Cambridge") and Cambridge Key Investments ("CKI"), became limited partners in Keystone. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 26 of the Complaint, and the said averments are therefore denied.

27.     Denied as stated. By way of further answer, Liberty states that, assuming the information described in Paragraph 27 was, in fact, false, he had no knowledge of this falsity, nor was he reckless in not knowing that the information was false, nor did he know that the Fund's monies had not been invested as represented. Liberty states that at no time did he engage in any fraudulent conduct. After a reasonable investigation, Liberty is without knowledge or

information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 27 of the Complaint, and the said averments are therefore denied.

28.     Admitted in part and denied in part. By way of further answer, Liberty states that he did, in fact, do business with Wal-Mart, and that he was president of, but did not have an ownership interest in, Cambridge, owned by the Boston businessman described in Paragraph 28 of the Complaint (referred to herein as "BB"). Liberty further states that, to his knowledge, Keystone invested in other BB-associated entities, some (but not all) of which were recommended by Liberty. Liberty also admits that he met Defendant Dale in or about 1996.

29.     Denied. By way of further answer, Liberty denies that he "controlled" Cambridge; rather, as mentioned above, this entity was owned by BB. Further, Liberty states that Cambridge reserved (but did not subscribe) with Keystone in the amount of $20 million in June 1999, which Defendants Dale informed Liberty and others could be paid within ninety days. By the time ninety days had elapsed, Defendants Dale informed Liberty that the Fund was now oversubscribed, and that the $20 million reservation was being reduced to $12.5 million. Further, the document described in Paragraph 29 is in writing and speaks for itself; Liberty denies any attempt to characterize its contents. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 29 of the Complaint, and the said averments are therefore denied.

30.     Admitted in part and denied in part. By way of further answer, Liberty denies that he "controlled" Cambridge or CKI; rather, as mentioned above, these entities were owned by BB. Liberty admits only that CKI subscribed with Keystone for $5 million in capital in September 1999 (as part of the reservation described in Liberty's response to Paragraph 29) and

that Cambridge and CKI assigned some of their Capital Commitment to new investors with Keystone's knowledge and consent. Further, the subscription agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents. Finally, Liberty denies that Cambridge and CKI made little or none of their required Initial Contribution.

31.     Denied as stated. By way of further answer, Liberty does not know what Defendants Dale, Regan, and Ligeti were aware of or knew. Liberty further denies that he ever accepted membership on a so-called "Advisory Board" or attended a meeting of any such Board. Assuming the existence of such a Board, Liberty denies that it had any authority or power, or ever exercised any authority or power. Furthermore, the Partnership Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its contents. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 31 of the Complaint, and the said averments are therefore denied.

32.     Admitted in part and denied in part. By way of further answer, Liberty denies the first sentence of Paragraph 32 and states that he was not engaged in a fraudulent scheme to divert the Fund's money to himself and others associated with him under any guise. As to the second sentence of Paragraph 32, Liberty admits only that Keystone did occasionally invest in holding companies in which Liberty or persons or entities affiliated with Liberty held an interest; furthermore, due to the ownership structure of these holding companies, the funds Keystone used to purchase those interests were, on occasion, wired to companies or individuals other than the holding companies themselves. Liberty denies the third sentence of Paragraph 32, and states that he never "instructed" Defendant Dale to distribute any Keystone funds. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the

truth of the remaining averments contained in Paragraph 32 of the Complaint, and the said averments are therefore denied.

33.     Denied.  By way of further answer, Liberty denies that he directed Defendant Dale to disburse any funds whatsoever; rather, any investments made by Keystone during this time period in holding companies in which Liberty or persons or entities affiliated with Liberty held an interest were all legitimate.  Liberty denies that he (1) engaged in or had knowledge of a series of fraudulent transactions or (2) diverted any funds to himself, his associates, or others.  Liberty denies either benefiting personally from any "diverted" Keystone monies or directing any funds to be diverted to third parties.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 33 of the Complaint, and the said averments are therefore denied.

34.     Admitted in part and denied in part.  By way of further answer, Liberty is unaware of the form of the "Fund's non-Liberty related investments."  Liberty admits that Keystone did occasionally invest in holding companies in which Liberty or persons or entities affiliated with Liberty had an interest and, when it did so, those investments were placed in LLC's.  Liberty denies that he either established or "partially owned and controlled" these LLC's as a general matter, or that he "directed" Defendant Dale to invest in these LLC's.  Liberty specifically denies diverting or being involved in the diversion of Keystone funds or knowledge of Dale so doing.

35.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 35 of the Complaint, and the said averments are therefore denied.

36.     Admitted in part and denied in part. By way of further answer, Liberty admits that he received financial statements from the Fund. As Liberty specifically denies diverting or being involved in the diversion of Keystone funds or "receiving millions of dollars as a result of these fraudulent transactions," he had no knowledge that the statements in question were false or in any way misleading. Consequently, there was nothing to disclose, and Liberty denies he possessed such a duty.

37.     Admitted in part and denied in part. By way of further answer, Liberty denies any involvement in or knowledge of a fraud in connection with BLT, LLC, and admits that he caused his attorneys to "form" this entity, but denies that he "co-owned" it. Liberty denies directing Dale to use any "sham transactions" or "to divert" any monies to himself, third parties associated with him, or any others. To the extent any monies were paid to these individuals or entities, such transactions were bona fide exchanges for value. Liberty further states that all monies disbursed during this transaction were consistent with the valuation agreed to by both Keystone and Keystone's independent counsel, Ballard Spahr Andrews & Ingersoll, LLP ("Ballard Spahr"). Both of these entities were fully aware of the valuation and allocation of the purchase price, as described in the Memorandum of Understanding entered into regarding this matter.

38.     Admitted in part and denied in part. By way of further answer, Liberty denies that the transaction involving BTC, LLC was in any way fraudulent, as all monies disbursed during this transaction were consistent with the valuation agreed to by both Keystone and Keystone's independent counsel, Ballard Spahr. Liberty denies any knowledge of whether Dale fraudulently and falsely altered the Fund's financial statements. Liberty admits that BLT, LLC was a holding company created to purchase some, but not all, of the membership interests in, (a) BTC, LLC, a holding company which owned shares of Biddeford, an established textile

manufacturer; (b) Legal Gourmet Foods, LLC, a start-up company which had a supply contract with Legal Seafoods, a well-known restaurant chain; and (c) Pasticerria Torina USA, LLC, a start-up company selling Italian cakes and desserts. Liberty further states that the structuring of this transaction allowed Keystone to allocate valuation as it felt appropriate. Specifically, while all agreed upon the total valuation for the investment stake Keystone was taking in all three entities, Keystone apparently desired to retain flexibility with the allocation. Rather than unnecessarily delay the transaction, no individual allocation was assigned. In order to do so, BLT, LLC was formed to purchase the interests in the individual holding companies.

39.     Denied. By way of further answer, Liberty states that the funds Keystone wired to the Maine law firm were disbursed in accordance with the Memorandum of Understanding signed by both Keystone and Liberty (a document drawn up at the insistence of Liberty). When Keystone advanced each sum of money, disbursements memoranda were created to reflect what happened to the funds. To the extent any funds were paid either to or for the benefit of Liberty or any individuals or entities related to Liberty, those sums were paid as part of the agreed-upon purchase price for those individuals' and/or entities' stakes in the holding companies referenced above. That purchase price was approved as fair by both Keystone and Ballard Spahr. Liberty denies that these disbursements were a "misuse of millions of dollars of Fund money" or any knowledge that this transaction was not properly reported in the Fund's financial statements.

40.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 40 of the Complaint, and the said averments are therefore denied.

41.     Denied. By way of further answer, Liberty denies that he directed or caused Keystone or Defendant Dale to wire $2 million to the personal bank account of a Liberty

employee for any purpose. When the employee referred to in Paragraph 41 inquired of Defendant Dale regarding the reason these funds were sent, Defendant Dale told him it was a mistake and gave him new instructions to return the funds. The employee then wired the money out, as requested, to the account specified by Defendant Dale. Liberty was completely uninvolved with either the original $2 million disbursement to his employee or Defendant Dale's use of the funds once they were wired back to him under Defendant Dale's instructions. Liberty further denies that he recommended St. George Crystal as a Keystone investment. Rather, the company came to Keystone's attention due to McCarthy. McCarthy's attorney and friend Mark Cushing was the CEO of St. George Crystal; further, it was Cushing who presented the investment to Defendants Regan and Ligeti. Liberty denies that he invested in Cambridge Crystal, LLC, rather, this was an entity funded by BB, with Keystone expected to co-invest (which it in fact did).

42. Denied. By way of further answer, Liberty states that he was completely uninvolved with either the original $2 million disbursement to his employee or Defendant Dale's use of the funds once they were wired back to him under Defendant Dale's instructions. The loan referred to in Paragraph 42 was a $750,000 line of credit from Progress Bank in favor of the Tryum snack food company. Previously Tryum had reached the limit of this line of credit and, in order to make payroll for the company's employees, Liberty personally guaranteed an overextension of the line to $950,000. Assuming the accuracy of the averment in Paragraph 42 of the Complaint that Liberty's employee was instructed by Defendant Dale to wire money in order to satisfy the line of credit in question, Liberty denies any knowledge of this transaction. To the contrary, Liberty believed he would have no liability on the guarantee because Keystone had promised to indemnify him should the bank have tried to call in the guarantee. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief

as to the truth of the remaining averments contained in Paragraph 42 of the Complaint, and the said averments are therefore denied.

43. Denied. By way of further answer, Liberty states that he was completely uninvolved with either the original $2 million disbursement to his employee or Defendant Dale's use of the funds once they were wired back to him under Defendant Dale's instructions. He did not "divert" any funds because he was not involved in the transaction at issue. The loan referred to in Paragraph 42 was a $750,000 line of credit from Progress Bank in favor of the Tryum snack food company. Previously Tryum had reached the limit of this line of credit and, in order to make payroll for the company's employees, Liberty personally guaranteed an overextension of the line to $950,000. Assuming the accuracy of the averment in Paragraph 42 of the Complaint that Liberty's employee was instructed by Defendant Dale to wire money in order to satisfy the line of credit in question, Liberty denies any knowledge of this transaction. To the contrary, Liberty believed he would have no liability on the guarantee because Keystone had promised to indemnify him should the bank have tried to call in the guarantee. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 43 of the Complaint, and the said averments are therefore denied.

44. Denied as stated. By way of further answer, Liberty states that the $100,000 in question was partial repayment for Liberty's expenses in promoting the Tryum snack food company. Specifically, Liberty paid for the Tryum sales team to travel and present the company's products to Sam's Club, Wal-Mart, Costco, Stop n' Shop, Safeway, and other similar large retailers. Defendant Dale promised that Keystone would reimburse Liberty due to Tryum's inability to do so.

45.     Denied. By way of further answer, Liberty states that he was unaware of Defendant Dale's allegedly fraudulent allocation of Keystone funds. Further, Randall Male, an associate of Liberty, discovered that Keystone had reported a $3,000,000 investment in St. George Crystal, which Liberty believed to be incorrect. Liberty then arranged a meeting with David Erb, an accountant from Berry Dunn McNeil & Parker, to come to his offices and have a meeting and discuss this investment. Erb did attend the meeting and informed Liberty that Defendant Dale had contacted a junior accountant in his firm and had instructed that accountant to book the St. George Crystal investment as a $3 million one. Liberty then reported this discrepancy to Defendant Ligeti and Ray Agran from Ballard Spahr, informing both that this amount was, to Liberty's knowledge, incorrect and, furthermore, that he was quite concerned about the error. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 45 of the Complaint, and the said averments are therefore denied.

46.     Denied. By way of further answer, Liberty states that he was unaware of Defendant Dale's allegedly fraudulent allocation of Keystone funds. Further, Randall Male, an associate of Liberty discovered that Keystone had reported a $3,000,000 investment in St. George Crystal, which Liberty believed to be incorrect. Liberty then arranged a meeting with David Erb, an accountant from Berry Dunn McNeil & Parker, to come to his offices and have a meeting and discuss this investment. Erb did attend the meeting and informed Liberty that Kerry Dale had contacted a junior accountant in his firm and had instructed that accountant to book the St. George Crystal investment at $3 million. Liberty then reported this discrepancy to Defendant Ligeti and Ray Agran from Ballard Spahr, informing both that this amount was, to Liberty's knowledge, incorrect and, furthermore, that he was quite concerned about the error. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief

as to the truth of the remaining averments contained in Paragraph 46 of the Complaint, and the said averments are therefore denied.

47.     Denied. By way of further answer, Liberty states that Keystone independently decided to invest in Café Britt, LLC. Liberty denies that he "directed" Defendant Dale to disburse any amounts; further, all investments made by Keystone in Café Britt were bona fide investments approved by independent counsel for both Liberty and Keystone. Liberty denies that any monies were improperly "diverted" to him or that he "directed" Defendant Dale to do so. By way of further answer, Liberty states that an entity owned by BB made a $1.5 million bridge loan to Grupo Café Britt at the time that Liberty and BB's jointly-owned entity acquired equity in the company. That bridge loan had an "equity kicker" attached to it. Keystone then purchased the note arising from this bridge loan from the BB-controlled entity, together with the "equity kicker." The funds paid by Keystone went to the BB-controlled entity because it owned the assets (the loan and "equity kicker") that Keystone wished to acquire and ultimately purchased. Subsequent to this initial investment, Keystone wanted to acquire an additional interest in Grupo Café Britt. In order to do so, Keystone purchased a portion of Liberty and his wife's existing equity interests in Grupo Café Britt. No "diversion" of funds occurred; the funds went to Liberty's wife when she sold a portion of her holdings. Liberty is unaware of what documentation Keystone did or did not receive. Finally, Liberty denies that this transaction or any others described in the Complaint were fraudulent, or that he had a duty to disclose his or his wife's receipt of Keystone funds in a bona fide transaction for value.

48.     Denied. By way of further answer, Liberty states that he is unaware of what Keystone's financial statements reflected with respect to its investments in Envisionet. Liberty denies that he recommended this investment to Keystone; to the contrary, Defendant Dale was

on the Envisionet Board of Directors. Liberty denies that he "directed" Dale to order the improper disbursal of any monies to Liberty or third parties associated with him. Liberty states that the entire Envisionet transaction was thoroughly reviewed by independent counsel for Envisionet (at the time, the fastest growing company in Maine), counsel for Liberty, and Ballard Spahr (counsel to Keystone). After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 48 of the Complaint, and the said averments are therefore denied.

49.     Denied. Liberty states that he is unaware of what Keystone's investments in Geosphere were or how they were disbursed. Liberty denies that he "directed" Defendant Dale to do anything with respect to Keystone's investment in Geosphere. To the contrary, Emergency Software, LLC (a BB-owned entity) purchased 74,350 shares from Keystone pursuant to a Securities Purchase Agreement, during which time Keystone was represented by Ballard Spahr. Keystone's counsel, Yuri Rozenfeld, confirmed in an e-mail dated March 23, 1999 that the transaction had been funded on March 19, 1999. Specifically, Rozenfeld stated that: "I understand that the transaction related to the transfer by Keystone of certain stock to Emergency Software LLC was funded on Friday, March 19, 1999. I also have not received any comments on the documentation and I assume that it is to all parties' satisfaction." Liberty further states on information and belief that the wire funding the purchase was sent from another BB entity, Boston Concessions Group. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 49 of the Complaint, and the said averments are therefore denied.

50.     Denied. By way of further answer, Liberty states Bali Hai Entertainment, Inc. was a company owned by Tracy Huston. In November of 1999, Cambridge Interactive, LLC (a

Liberty and BB jointly-owned entity) caused $250,000 to be delivered to Bali Hai pursuant to a Stock Purchase Agreement. At approximately the same time, John Donnelly ("Donnelly") (the investor referred to in Paragraph 50 of the Complaint), made a $250,000 Capital Contribution to Keystone. These funds were directed to the Maine law firm as part of the reservation assignments (discussed in Paragraph 29 above), that Cambridge and CKI had agreed to with Ballard Spahr (counsel to Keystone). Defendant Dale, on behalf of Keystone, instructed that the money from Donnelly ($250,000) be disbursed directly to Bali Hai. These are the funds that were delivered to Bali Hai. Liberty denies that Defendants Regan and Ligeti had "previously rejected Bali Hai as a Fund investment." To the contrary, Defendant Ligeti was quite interested in Bali Hai as an investment due to the potential technological compatibility between it and another company in which Keystone invested called Hollywood Stock Exchange.

51.     Denied. By way of further answer, Liberty states that the documents showing Donnelly's status as a limited partner (including Keystone's signature) were signed and delivered to Donnelly and counsel for Keystone by counsel for Liberty at the time Donnelly purchased $250,000 of Cambridge's Keystone subscription. When Keystone contacted counsel for Liberty regarding Donnelly's K-1 form for 1999, counsel produced to both Donnelly and Keystone a full set of the documents referenced above showing that Donnelly had purchased a portion of the Cambridge subscription in 1999 and had delivered $250,000 to Keystone. Donnelly purchased a portion of Cambridge's reservation, as fully and contemporaneously documented. Further, Liberty has no knowledge at to (1) what Keystone's accounting staff did or did not do with respect to Donnelly's investment other than the information contained in this Paragraph and Paragraph 50 or (2) what Defendant Dale did or did not disclose to the Fund, or Defendants Regan and Ligeti.

52.      Denied.  By way of further answer, Liberty states that his offices voluntarily provided a significant amount of information to Defendant Dale's financial officer, Joe Kopec ("Kopec") (the individual identified in Paragraph 52 of the Complaint by the initials "JK") in an effort to aid his investigation.  Furthermore, Liberty and his offices repeatedly contacted Ray Agran at Ballard Spahr concerning imperfections in Keystone documentation.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 52 of the Complaint, and the said averments are therefore denied.

53.      Denied.  By way of further answer, Liberty states that his offices voluntarily provided a significant amount of information to Defendant Dale's financial officer, Kopec in an effort to aid his investigation.  Furthermore, Liberty and his offices repeatedly contacted Ray Agran at Ballard Spahr concerning imperfections in Keystone documentation.  After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 53 of the Complaint, and the said averments are therefore denied.

54.      After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 54 of the Complaint, and the said averments are therefore denied.

55.      Denied.  By way of further answer, Liberty denies that any funds were "diverted" to him by Defendant Dale, that he was involved in any "improper transactions" or "diversion of Fund assets," or that he had any knowledge thereof.  Liberty and his offices voluntarily provided a significant amount of information to Defendant Dale's financial officer, Kopec in an effort to aid his investigation.  Furthermore, Liberty and his offices repeatedly contacted Ray Agran at

Ballard Spahr concerning imperfections in Keystone documentation. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 55 of the Complaint, and the said averments are therefore denied.

56.     Admitted in part and denied in part. Liberty has no knowledge of the allegations made in the first, second, and third sentences of Paragraph 56 of the Complaint. Liberty admits that Keystone notified Cambridge and CKI that they were in default in August 2000. By way of further answer, Liberty states that, prior to, and contemporaneous with, the negotiation of the settlement agreement, Liberty was threatening to sue Keystone for a number of contractual breaches. At one point, Liberty had calculated that the damages caused by Keystone's breaches greatly exceeded those Keystone claimed due from him. Furthermore, the fact that Liberty "refused to allow the sale of the defaulted interests" was irrelevant, as Keystone had already declared the subscriptions in default. Thus, under the terms of the Partnership Agreement, Keystone could have simply taken the units.

57.     Denied. By way of further answer, Liberty states that, prior to, and contemporaneous with, the negotiation of the settlement agreement, Liberty was threatening to sue Keystone for a number of contractual breaches. At one point, Liberty had calculated that the damages caused by Keystone's breaches greatly exceeded those Keystone claimed due from him. In addition, there was significant value to all of the assets that transferred to Keystone as a result of settlement. The value of the settlement to Keystone, therefore, was far less questionable than stated at in Paragraph 57 of the Complaint. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 57 of the Complaint, and the said averments are therefore denied.

58. Admitted in part and denied in part. Liberty has no knowledge of Defendants Regan and Ligeti's "findings," but Liberty denies directing, ordering, receiving, or being involved in any way in any "improper payments" or "questionable investments." Liberty admits that on or about March 29, 2001, he and other individuals and entities entered into a settlement agreement with Keystone; however, Liberty denies that he received any "Keystone V monies as part of the fraudulent transactions" or knowledge of any of the other released entities having engaged in such transactions. Further, the Settlement Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its content. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 58 of the Complaint, and the said averments are therefore denied.

59. Denied. By way of further answer, the Settlement Agreement is in writing and speaks for itself; Liberty denies any attempt to characterize its content. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 59 of the Complaint, and the said averments are therefore denied.

60. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 60 of the Complaint, and the said averments are therefore denied.

61. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 61 of the Complaint, and the said averments are therefore denied.

62.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 62 of the Complaint, and the said averments are therefore denied.

63.     Admitted in part and denied in part. Liberty admits only that the purchase agreements for CKI's interests in Keystone were executed on or about April 3, 2001 and that CKI retained an interest in Keystone. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 63 of the Complaint, and the said averments are therefore denied.

64.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 64 of the Complaint, and the said averments are therefore denied.

65.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 65 of the Complaint, and the said averments are therefore denied.

66.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 66 of the Complaint, and the said averments are therefore denied.

67.     Denied. By way of further answer, Liberty states that he and the entities controlled by him have complied with the Settlement Agreement. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the remaining averments contained in Paragraph 67 of the Complaint, and the said averments are therefore denied.

68.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 68 of the Complaint, and the said averments are therefore denied.

69.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 69 of the Complaint, and the said averments are therefore denied.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

70.     Paragraphs 1 through 69 above are incorporated herein by reference as if fully set forth.

71.     Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint.

72.     Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

73.     Paragraphs 1 through 72 above are incorporated herein by reference as if fully set forth.

74.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 74 of the Complaint, and the said averments are therefore denied.

75. Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint, nor did he knowingly and substantially assist Defendant Dale in so doing.

76. Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint, nor did he knowingly and substantially assist Defendant Dale in so doing.

## THIRD CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

77. Paragraphs 1 through 76 above are incorporated herein by reference as if fully set forth.

78. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 78 of the Complaint, and the said averments are therefore denied.

79. After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 79 of the Complaint, and the said averments are therefore denied.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act

80. Paragraphs 1 through 79 above are incorporated herein by reference as if fully set forth.

81.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 81 of the Complaint, and the said averments are therefore denied.

82.     Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint, nor did he knowingly and substantially assist Defendant Dale or anyone else in so doing.

83.     Denied as a conclusion of law. By way of further answer, Liberty states that at no time did he engage in any of the fraudulent conduct alleged in the Complaint, nor did he knowingly and substantially assist Defendant Dale or anyone else in so doing.

## FIFTH CLAIM FOR RELIEF

### Violations of Section 17(a)(2) of the Securities Act

84.     Paragraphs 1 through 83 above are incorporated herein by reference as if fully set forth.

85.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 85 of the Complaint, and the said averments are therefore denied.

86.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 86 of the Complaint, and the said averments are therefore denied.

## SIXTH CLAIM FOR RELIEF

### Violations of Section 206(2) of the Advisers Act

87.     Paragraphs 1 through 86 above are incorporated herein by reference as if fully set forth.

88.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 88 of the Complaint, and the said averments are therefore denied.

89.     After a reasonable investigation, Liberty is without knowledge or information sufficient to form a belief as to the truth of the averments contained in Paragraph 89 of the Complaint, and the said averments are therefore denied.

## FIRST AFFIRMATIVE DEFENSE

1.     Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

2.     Liberty is not liable because he did not employ any device, scheme, or artifice to defraud, did not engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person, and did not knowingly and substantially assist any other person in so doing.

## THIRD AFFIRMATIVE DEFENSE

3.     Liberty is not liable because he did not make any false or misleading statements of material fact or omission of material fact, and is not responsible in law or fact for any alleged false or misleading statement or omission of material fact by others.

## FOURTH AFFIRMATIVE DEFENSE

4.      Liberty acted at all times in good faith and had no knowledge, and was not reckless in not knowing, that any alleged statement or omission made by any of the other Defendants was false or misleading.

## FIFTH AFFIRMATIVE DEFENSE

5.      Plaintiff's claims, if any, are barred by the applicable statute of limitations and/or doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

6.      Liberty had no duty to disclose any facts allegedly not disclosed.

## SEVENTH AFFIRMATIVE DEFENSE

7.      Defendant reserves all other affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or in equity, that may now or in the future be available based on discovery or any other factual investigation concerning this case.

**WHEREFORE**, Liberty respectfully requests this Court grant it relief as follows:

(a)      Judgment in favor of Liberty on the SEC's Complaint in this matter;

(b)      An award of Liberty's costs in this action; and

(c)      Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Defendant Michael A. Liberty hereby demands trial by jury for all issues so triable.


/s/ Jay A. Dubow
Jay A. Dubow (PA Attorney I.D. #41741)
Brian J. Slipakoff (PA Attorney I.D. #91850)

Attorneys for Defendant Michael A. Liberty


Of Counsel:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103-2097
(215) 977-2000

Dated: June 19, 2006

## CERTIFICATE OF SERVICE

I, Brian J. Slipakoff, hereby certify that on June 19, 2006, I caused a true and correct

copy of the foregoing Answer to be filed via electronic filing, and that this document was made

available for viewing and downloading on the Court's ECF system.

/s/ Brian J. Slipakoff
Brian J. Slipakoff, Esquire