**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 06-1030** |
| | : | |
| MICHAEL A.  LIBERTY, et al. | : | |

McHUGH, J.                                                                  March 7, 2022

<u>**MEMORANDUM**</u>

    This is a civil enforcement action brought by the Securities Exchange Commission.  The

SEC now moves, pursuant to a consent and final judgment, to lift a suspended disgorgement of

funds and impose civil penalties against Michael Liberty for misrepresentations and omissions

made regarding his finances on which the SEC relied in its agreement to suspend enforcement of

these remedies.  The SEC's original complaint detailed a pernicious and extensive fraud directed

by Liberty that swindled $27 million from a private venture capital fund whose primary investors

were public pension funds, including the City of Philadelphia Board of Pensions and Retirement

and the Pennsylvania Statement Employees Retirement System.  To resolve the action, Liberty

consented to the entry of final judgment against him.  As part of this consent, the SEC agreed to

suspend all but $600,000 of the $5,956,935 in disgorgement it was seeking for funds that had

benefited Liberty directly, and further to refrain from pursuing the imposition of a civil penalty.

The SEC negotiated and offered this consent on the basis of Liberty's forthright disclosure of his

financial information.  That disclosure was assisted by a consulting firm that reviewed but did not

audit Liberty's finances based on the information that Liberty provided to it.  If it was later found

that "Defendant's representations to the Commission concerning his assets, income, liabilities, or

net worth were fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made," the SEC retained the right to petition the Court to reinstate the full disgorgement and to impose civil penalties.  Liberty was limited to contesting whether such a misrepresentation occurred, and he waived all other defenses to the reinstatement and imposition of the disgorgement and civil penalties.

To support the present motion, the SEC has produced evidence that Liberty intentionally withheld information about the bank accounts that he controlled in the name of Xanadu Partners. He used these accounts to conduct the vast majority of both his personal and business spending, and, by burying these accounts, he concealed from the SEC over ten million dollars in receipts and disbursements during the relevant time period.  Both the act of concealment and the financial information so concealed would have been extremely relevant to the SEC's determination to offer the consent judgment that included suspended disgorgement and penalties, and it was therefore material to the transaction at issue.  I thus conclude that Liberty is in contempt of the consent and final judgment and will reinstate the disgorgement and impose civil penalties as detailed below.

## I.   **Background**

### A.  Procedural History[1]

The SEC brought the original enforcement action in 2006 against Liberty and a number of co-conspirators for their exploitation of a venture capital fund, Keystone V—whose primary investors were large public pension funds—as an illicit source of funds for Liberty to use

---

[1] This case was reassigned from Judge DuBois on July 21, 2021.  ECF 166.  The facts at issue are taken from the SEC's Complaint.  ECF 1.  In Liberty's consent to the entry of final judgment, he waived the right to contest the allegations of the Complaint as a defense to the present action.  Consent ¶ 3, ECF 64.  While the facts of the underlying complaint are not necessary to the determination of liability here, they are relevant to the Court's exercise of discretion in reinstating the suspended disgorgement and imposing civil penalties.  Liberty also waived any right to contest the imposition of or the amount of these remedies as will be detailed further below.  *See* Consent ¶ 3.

personally and to invest in speculative ventures.  Between 1997 and 2002, Liberty leveraged his

personal relationship with Kieran J. Dale, one of three managing directors of the fund, to direct

the capital contributions of Keystone V limited partners into accounts that Liberty or third-parties

associated which Liberty controlled.  Compl. ¶ 32.  Dale then recorded and reported these

disbursements to the limited partners of the fund as investments in portfolio companies, overstating

the nature and amount of these investments and failing to disclose Liberty's involvement in the

investments.  Compl. ¶¶ 32, 34-36.  Approximately $27 million in fund assets, more than a quarter

of the total committed capital of Keystone V, was disbursed at Liberty's direction.  Compl. ¶ 33.

Of the $27 million, $9 million was diverted directly to Liberty and his associates, with

approximately $4.5 million benefiting Liberty personally.  *Id.*  The remaining $18 million was lost

when the businesses to which Liberty had directed the funds failed.  *Id.*[2]

On the same day that the SEC's Complaint was filed in March 2006, all of the named

defendants, except for Michael Liberty, filed consents to final judgment, ECF 2, 3, 4, 5, 6, 7, with

judgment entered against these defendants a month later, ECF 13, 14, 15, 16, 17, 18.  Over the

course of the next three years, the SEC and Liberty engaged in both discovery and settlement

discussions.  As evident from the numerous letters submitted to the Court in the form of status

---

[2] In mid-1999, Liberty also became a limited partner in Keystone V through two entities he controlled which subscribed to contribute $25 million in capital to the fund but never actually supplied the promised investment, violating the terms of the partnership agreement.  Compl. ¶¶ 29-31.  These defaulted interests were covered up by Dale and the other two managing directors John R. Regan and Peter E. Ligeti.  Compl. ¶¶ 52-55.

As relevant here, the size of the pretended investment in the fund gave Liberty access to Keystone V's advisory board.  Compl. ¶ 31.  More importantly, these defaulted interests—and the managing directors' interests in concealing them from other limited partners—gave Liberty leverage to force a settlement of any claims related to his conversion of the fund's investments.  Compl. ¶ 56 ("Liberty refused to allow the sale of the defaulted interests without such an agreement.").  Liberty was able to negotiate with Dale, Regan, and Ligeti for a complete release of liability for Liberty and his associates in exchange for a package of transactions which ostensibly squared Liberty's companies with Keystone but in reality overinflated the value of much of the consideration provided by Liberty or his companies, and in some cases promised consideration that was never delivered.  Compl. ¶¶ 56-60.

reports and requests for extensions of discovery deadlines, the principal obstacle to settlement was the SEC's attempts to get an adequate picture of Liberty's expansive, convoluted, and byzantine financial status. The SEC noted that initial discussions focused on "questions the staff has relating to the submitted materials, and the means by which Mr. Liberty must clarify and support the information contained in them." Kase Letter of June 28, 2006, ECF 24. Liberty was apparently unable to clarify and support these materials sufficiently, and the parties resumed discovery at the end of that summer. Kase Letter of Aug. 8, 2006, ECF 26. By May 2007, the SEC and Liberty had resumed settlement discussions and requested to delay discovery. Counsel for Liberty represented to the Court that the previous discussions "ended because of the parties' inability to agree on the value of Mr. Liberty's assets and liabilities." Dubow Letter of May 16, 2007, ECF 36. In order to resume settlement negotiations, Liberty's counsel "engaged forensic accountants to assist [them] in valuing Mr. Liberty's assets and liabilities." *Id.*

The forensic accountant retained for this purpose was FTI Consulting. By August 2007, "the forensic accountants' initial evaluation [was] near completion and the parties [had] scheduled a meeting to discuss settlement right after Labor Day." Dubow Letter of Aug. 14, 2007, ECF 39. As of January 2008, discussions were ongoing, with both parties agreeing that the retention of FTI had "greatly assisted the parties' settlement discussions." Dubow Letter of Jan. 15, 2008. In March 2008, the parties had reached an agreement in principle that the SEC attorneys were prepared to recommend to the Commission for approval. Kase Letter of Mar. 18, 2008. Before presenting the Court with a final judgment, the SEC was waiting for Liberty to provide "more current financial information in the form of a sworn financial affidavit or declaration, and to execute a written Consent." *Id.* As of September 2008, the SEC had "reviewed the numerous forensic accounting schedules regarding Mr. Liberty's financial situation that Mr. Liberty had

provided previously" and at that time Liberty was "in the process of reviewing these schedules with his accountants so they can be finalized as of a current date." Knauer Letter of Sept. 17, 2008, ECF 51. Over the next two years, counsel for the SEC filed five more letters with the Court requesting extensions, and in each of those letters the SEC noted a new instance where it requested more information about "his complex financial arrangements," with Liberty providing additional documentation, and the SEC reviewing that new information prior to obtaining Commission approval. Kase Letter of Mar. 17, 2009, ECF 55; Kase Letter of June 17, 2009, ECF 57; Kase Letter of Sept. 16, 2009, ECF 59; Kase Letter of Dec. 14, 2009, ECF 61; Kase Letter of Mar. 15, 2010, ECF 63. Together, these letters reflect that Liberty made ongoing representations to the SEC regarding his finances over the course of the litigation and that his representations were not restricted to his documented disclosures.

On June 9, 2010, the Consent and Final Judgment were finally entered by the Court. Consent, ECF 64; Final Judgment, ECF 65. As part of the Consent, Liberty consented to the Final Judgment as it was entered, and specifically consented to the conditions related to the suspension of the full disgorgement and civil penalties, with the same language used in the Consent as in the Final Judgment. *Compare* Consent ¶ 3 *with* Final Judgment § IV.[3] Section IV of the Final Judgment reads in full:

> IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $4,049,000, representing profits gained as a result of the conduct alleged in the Complaint, together with pre-judgment interest thereon in the amount of $1,907,935, for a total of $5,956,935. Based on Defendant's sworn representations in his financial Declaration and other documents and information submitted to the Commission, however, the Court is not ordering Defendant to pay a civil penalty, and payment of all but $600,000 of the disgorgement and pre-judgment interest thereon is waived. Defendant shall pay

---

[3] For convenience sake, I will primarily be citing to the Final Judgment going forward, with the understanding that Liberty's Consent was expressly acknowledged as to all the relevant provisions discussed.

that portion of disgorgement and pre-judgment interest not hereby waived, which totals $600,000, in the manner provided for in paragraph V of this Final Judgment. Defendant shall also pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961. **The determination not to impose a civil penalty and to waive payment of all but $600,000 of the disgorgement and pre-judgment interest is contingent upon the accuracy and completeness of Defendant's financial Declaration. If at any time following the entry of this Final Judgment the Commission obtains information indicating that Defendant's representations to the Commission concerning his assets, income, liabilities, or net worth were fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made, the Commission may, at its sole discretion and without prior notice to Defendant, petition the Court for an order requiring Defendant to pay the unpaid portion of the disgorgement, pre-judgment and post-judgment interest thereon, and the maximum civil penalty allowable under the law. In connection with any such petition, the only issue shall be whether the financial information provided by Defendant was fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made.** In its petition, the Commission may move this Court to consider all available remedies, including, but not limited to, ordering Defendant to pay funds or assets, directing the forfeiture of any assets, or sanctions for contempt of this Final Judgment. The Commission may also request additional discovery. Defendant may not, by way of defense to such petition: (1) challenge the validity of the Consent or this Final Judgment; (2) contest the allegations in the Complaint filed by the Commission; (3) assert that payment of disgorgement, pre-judgment and post-judgment interest or a civil penalty should not be ordered; (4) contest the amount of disgorgement and pre-judgment and post-judgment interest; (5) contest the imposition of the maximum civil penalty allowable under the law; or (6) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

(emphasis added to conditions regarding suspension).

B. The Present Proceedings

In 2016, the SEC initiated the current proceedings based on information obtained in another enforcement action that it believed showed that Liberty had concealed assets in his original disclosures.[4]  *See* SEC First Motion Br. at 5-6, ECF 83-1.  The SEC sought to lift the suspended

---

[4] Much of the new information, contained in emails and testimony, appears to come from Jim Stanley, one of Liberty's closest business associates during the time period in question.  Liberty suggests personal bias, asserting that Stanley "went to the SEC following years of hotly contested litigation with Mr. Liberty." Liberty Br. at 11 n.5.

Since initiating the present proceedings, the SEC and the DOJ commenced three additional actions against Liberty, two of which were criminal indictments, involving both Xanadu and Mozido which are the

disgorgement and petitioned the Court for maximum civil penalties. *See id.* Following substantial briefing, the Court ordered discovery on the matter. Order of Aug. 24, 2017, ECF 113. After several discovery disputes arose, the Court referred them to Magistrate Judge Thomas J. Rueter. Order of May 24, 2018, ECF 124. In late summer 2019, the parties submitted pretrial memoranda, proposed findings of fact and conclusions of law, and raised objections in anticipation of a final pre-trial conference in October 2019. ECF 143, 144, 145, 146, 147, 148, 149. On the eve of trial, Liberty moved and was granted a stay of these proceedings to allow him to litigate, without prejudice to his Fifth Amendment rights, a criminal matter brought against him by the federal government in February 2019 for defrauding investors in his company Mozido and converting their investments to his personal use through his control over the accounts of his company Xanadu Partners. *See* Motion, ECF 154; Order, ECF 158; *see also United States v. Liberty*, No. 2:19-cr-30 (D. Maine Feb. 27, 2019). In January 2021, President Trump granted Liberty a full pardon as to the pending charges and the present litigation resumed. *See* Joint Status Report of May 4, 2021, ECF 160.

Following reassignment of this case, limited additional discovery was permitted at the parties' joint request, ECF 169, and supplemental briefs were submitted, ECF 172, 173, 174, 175, 176. The parties were then requested to address the evidentiary standard applicable to the pending

---

putative business entities also implicated here. *See United States v. Liberty*, No. 2:16-cr-144 (D. Maine Nov. 28, 2016) (using Xanadu to shield illegal contributions to President Trump's election campaign, per Sentencing Transcript, ECF 31); *SEC v. Liberty*, No. 2:18-cv-139 (D. Maine Mar. 30, 2018) (selling fraudulent notes to investors in Mozido, naming Xanadu codefendant as a recipient of illegally obtained funds); *United States v. Liberty*, No. 2:19-cr-30 (D. Maine Feb. 27, 2019) (selling fraudulent notes to invest in Mozido). Liberty pleaded guilty and was sentenced in the 2016 criminal action, and he was granted full clemency by President Trump in January 2021. Trial in the 2019 criminal action was pending when he was granted a full pardon by President Trump in January 2021. The civil action is ongoing, and there is a motion for a protective order currently pending related to some documents at issue in those proceedings. ECF 137, *SEC v. Liberty*, No. 2:18-cv-139 (D. Maine Dec. 7, 2021). Liberty does not argue that the materials at issue in the present motion are implicated in any way by that motion or that these materials are subject to the claims of privilege apparently asserted in the parallel proceeding. *See* Liberty Br. at 12 n.6.

motion.  ECF 178, 179.  The parties agreed in a status report submitted to the Court in August

2021 "that the record in this matter is clear and this case is ripe for determination based on the

existing record before the Court," ECF 168, and neither party saw a need for an evidentiary hearing

during a later November 2021 telephonic status conference, ECF 171.

      C.  <u>The Evidence Produced in Discovery</u>

As a baseline, both parties have produced documents that represent summaries of Liberty's

financial information as provided to the SEC.  The first of these is the March 10, 2009 submission

that Liberty made to the SEC containing (1) the FTI report on Liberty's finances as of December

31, 2007 with a May 2008 update ("FTI report"); (2) an SEC form Statement of Financial

Conditions as of January 31, 2009 filled out by Liberty ("January 2009 Statement"); (3) and a

signed declaration of Liberty attesting that those documents provided "a complete and accurate

depiction of [his] financial situation as of December 31, 2007" and that "[t]here [had] been no

material improvement in [his] financial situation since December 31, 2007" and instead his

"financial situation has deteriorated further since then."  Liberty Br. at Ex 4, ECF 173; SEC Br. at

Ex. 2, ECF 174-2.  The parties also include another SEC form Statement of Financial Conditions

as of June 30, 2009, signed on July 16, 2009 ("June 2009 Statement").  Liberty Br. at Ex 5, ECF

173; SEC Br. at Ex. 3, ECF 174-3.  Both the January 2009 Statement and the June 2009 Statement

include on their signature page the following affirmation:

> Under penalties of perjury, I declare that I have examined the information given in
> this statement, and attached hereto, and, to the best of my knowledge and belief, it
> is true, correct, and complete.  I further declare that I have no assets, owned either
> directly or indirectly, or income of any nature other than as shown in, or attached
> to, this statement.  I understand that any material misstatements or omissions made
> by me herein or in any attachments hereon may constitute criminal violations,
> punishable under 18 U.S.C. § 1001.

*Id.* at 9.  Notably, in the January 2009 Statement, Liberty left the line items blank and referred

entirely to the FTI report, which putatively reflected his finances as of December 2007, in order to

provide the requested information.  In the June 2009 Statement, Liberty listed some line items and included a listing of expenses, all of which were lifted directly from that original FTI report, while adding one additional line item of $700,000 in legal fees, *id.* at 2, and a footnote indicating a $200,000 bill from FTI and an anticipated reduction in personal expenses of $97,559, *id.* at 6.  The only change made to the balance of total assets and liabilities was the $700,000 legal fees bill.

The FTI report consists of a cover letter, nine pages summarizing Liberty's finances, and tens of appendix pages that attempt to provide line-item type detail for all of Liberty's various financial interests.  The cover letter states that the report, which includes the May 2008 update, "analyses and summarizes Mr. Liberty's assets and liabilities as of December 31, 2007." To produce the report, FTI analyzed documents provided by Liberty or his agents.  "Such documentation included: bank statements; loan statements; financial statements; income tax returns and information returns filed with the Internal Revenue Service; property appraisals originally obtained in connection with secured loans; notes to banks, individuals, and other entities, and debt agreements."  The cover letter included two key caveats.  First, it made plain that the summary FTI prepared was "not either a review or audit of Mr. Liberty's assets and liabilities as those services are defined by the American Institute of Certified Public Accounts."  Second, it acknowledged documentary gaps that hindered FTI from being able to positively determine that "all of Mr. Liberty's assets and liabilities were included" because "Mr. Liberty does not maintain accounting records sufficient to assure that all transactions and interests are recorded."

Against these baseline representations made to the SEC regarding Liberty's finances, the SEC has produced and attached to its briefings two types of evidence to establish that Liberty misrepresented his financial information to the SEC while negotiating the consent and final judgment.  First, the SEC has produced substantial evidence that Liberty intentionally concealed

extremely significant information about bank accounts and credit cards which he controlled through an entity, ostensibly in trust for his children, named Xanadu Partners LLC. At least as of May 2008, FTI had been informed that Xanadu existed. But it was listed on the FTI report with other entities which Liberty represented as a Non-Real Estate Business, owned by the Liberty Children, which had "no value and/or few or no assets." *See* FTI Report at 5-6 (describing Non-Real Estate Businesses); and FTI Report Appendix (listing Xanadu Partners, LLC with 100% ownership in "Michael A. Liberty Children's Trust" and "comments: Liberty kids"). The accounts in the name of Xanadu Partners included a checking account, a savings account, and a business credit card account for which Liberty, his wife Brittany, and his daughter Adriana were issued cards. According to bank statements obtained during discovery for these proceedings, between December 2007 when Liberty's finances were initially assessed and June 2010 when the Consent and Final Judgment were entered, these accounts showed cumulative receipts of approximately $16 million, with an equal amount of disbursements.[5] Xanadu Bank Statements, ECF 174, Ex. 13. Over $1 million of this spending was made using the Xanadu Partners credit cards. Xanadu Credit Card Statements, ECF 174, Ex. 14. The first major set of receipts and disbursements began in December 2007 with $2.2 million received and $1.2 million of disbursements. *Id.*[6] The account

---

[5] The SEC in its brief refers to around $24 million of balanced disbursements and receipts between the checking and savings accounts for the period of October 30, 2007 and December 31, 2010. SEC Br. at 10. The numbers above differ in that they only go to June 2010 when judgment was entered and, presumably, when Liberty's representations to the SEC ceased. The numbers above also do not include transfers between the checking and savings accounts; it is not clear if the SEC calculations do.

[6] Based on the Court's review of the statements, the cumulative receipts and expenses of the combined checking and savings accounts at the dates of Liberty's documented representations are roughly:

|  | Total Receipts | Total Disbursements |
|---|---|---|
| Dec 2007 | $2,200,100.00 | $1,265,838.99 |
| May 2008 | $3,355,000.00 | $3,199,775.88 |
| Jan 2009 | $6,207,409.06 | $6,131,363.53 |
| Jun 2009 | $9,562,665.82 | $9,427,699.14 |
| Jun 2010 | $16,022,276.17 | $16,004,861.40 |

was clearly used for both personal and business expenses, as admitted by Liberty.  *See* Liberty Br. at 20-21 (citing depositions of Michael Liberty, Ex. 9 to Liberty Br., and Brittany Liberty, Ex. 10 to Liberty Br.).  Besides over $1 million spent through the Xanadu credit card, over $480,000 was spent through debit card transactions or direct cash withdrawals, and over $580,000 went to paying off other credit cards held by Liberty or his intimates, and well over $5 million was directly transferred to unknown bank accounts. Xanadu Bank Statements, ECF 174, Ex. 13. The remaining withdrawals took place through checks and wires whose eventual payees would be completely unfeasible to trace now almost 15 years later, excepting perhaps about $1.8 million of payments sent to accounts in the name of other business entities controlled by Liberty.  *Id.*  Based on these bank statements, and in light of Liberty's failure to regularly keep records tracking his personal and business transactions as noted by FTI's analysis, it would be impossible to thoroughly and accurately distinguish the nature of all these transactions.

In addition to the bank statements, the SEC has produced deposition testimony and emails that demonstrate an intentional effort on Liberty's part to conceal from both FTI and the SEC the true nature of Xanadu and details about its bank accounts.  This begins with the deposition testimony of Jim Stanley, "the CEO and CFO of [Liberty's] real estate group."  Liberty Dep. (Apr. 4, 2018) 63:5-7, ECF 173, Ex. 9.  Liberty had tasked Stanley with providing FTI with the information used in the declaration submitted to the SEC.  Stanley Dep. (June 1, 2016) 49:3-23, ECF 174-5.  Stanley testified that he "was told not to disclose [Xanadu] to the SEC." *Id.* 46:15-17. This evidence also includes emails between Liberty and various third parties that demonstrate both Liberty's control of the Xanadu account and his intention to keep it secret.  Emails Regarding Simses Wire, Dec. 18, 2007, ECF 174-7; Emails Regarding Financing, May 26, 2009, ECF 174-

8. And this evidence concludes with particularly inculpatory emails between Liberty and Stanley specifically regarding the concealment of information about Xanadu and a predecessor company, Beverly Hills Investment Partners, (BHIP), from the FTI and the SEC. Emails between Liberty and Stanley, Mar. 27, 2008, ECF 174-10; Emails between Liberty and Stanley, May 21, 2008, ECF 174-11; Emails between Liberty and Stanley, Dec. 31, 2008, ECF 174-12.

The second type of evidence that the SEC has produced includes various emails to investors and submissions to banks where Liberty represents that his personal net worth and the value of specific assets that he held were far greater than the values and net worth that he reported to the SEC. Most notably, this evidence includes several emails to potential investors in Mozido, a fintech startup that would become the center of Liberty's other legal issues over the next few years, claiming both that Mozido was worth over $127 million (in some emails over $700 million) with zero debt and that Liberty had a significant stake in the enterprise, perhaps as much as 70% thereof. ECF 174-4; ECF 176-15; ECF 176-16. Separately, the SEC has identified a submission to a bank made in June 2005 that values his business interests (excluding real estate owned) at $22.6. This contrasts with the roughly $5.2 million at which he values them to the SEC as of year-end 2007. The bank submission also completely excludes approximately $35 million in liabilities dating back to 1997 that he listed in the SEC disclosures. ECF 174-36. If Liberty were being completely honest with both the SEC and the bank, his net worth would have had to have declined by over $50 million over the course of 18 months. This stark inconsistency does not by itself establish which representations are true, or perhaps partially true. Such evidence is, however, relevant to showing a modus operandi of intentionally revealing, omitting, or misstating financial information to various parties when convenient for Liberty, and thus is relevant to whether Liberty intentionally concealed material information about his financial assets from the SEC.

## II.  **Legal Standard**

Alleged violations of a civil consent judgment are adjudicated under the Court's power to find parties in contempt.  *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 577 (3d Cir. 2010).  "A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order."  *Marshak v. Treadwell*, 595 F.3d 478, 485 (3d Cir. 2009).  "Although courts should hesitate to adjudge a defendant in contempt when there is ground to doubt the wrongfulness of the conduct, an alleged contemnor's behavior need not be willful in order to contravene the applicable decree."  *Lane Labs-USA,* 624 F.3d at 582 (cleaned up).  Here the parties agree that a valid order of the court existed and that Liberty had knowledge of that order, but dispute whether he obeyed that order.[7]

Because Liberty only contests whether a violation occurred and does not raise an affirmative defense of substantial compliance or impossibility, I reject the SEC's contention that the burden shifting framework suggested by *United States v.  Rylander*, 460 U.S. 752 (1983), applies in deciding this motion.[8]

The meaning of the civil consent judgment is at issue in this case.  The Consent and Final Judgment "are construed according to traditional precepts of contract construction." *Fox v. U.S.*

---

[7] Technically Defendant Liberty's violation occurred prior to the entry of judgment, as the alleged misrepresentations were made to the SEC and, by proxy, to the Court as the basis for the Court's final judgment suspending a substantial portion of the ordered disgorgement and related interest, as well as civil penalties.  Nevertheless, the violation alleged was expressly contemplated by the Consent and Final Judgment, and the Judgment prescribed the remedies available to the Court if such a violation were found, including reinstating the full disgorgement and interest and imposing otherwise suspended civil penalties. The Judgment itself also characterized these remedies as deriving from "contempt of this Final Judgment." In light of this posture, the Court requested briefing on the standard to employ, and both parties agreed that the "clear and convincing" standard found in *Lane Labs* was applicable to the present motion. ECF 178, 179.

[8] Liberty raises insolvency, not as a defense of impossibility, but as factual evidence in support of his argument that he did not violate the conditions of the final judgment.

*Dept. of Hous. and Urb. Dev.*, 680 F.2d 315, 319 (3d Cir. 1982).   When "the United States is a party (either directly or through a federal agency)," "contractual claims to enforce [a consent judgment] arise under federal common law." *E.O.H.C. v. Sec. U.S. Dept. of Homeland Sec.*, 950 F.3d 177, 193 (3d Cir. 2020).   "[W]hen parties seek to enforce agreements adopted in consent orders, courts construe terms of the settlement based on the intent of the parties, not of the court." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 265 (3d Cir. 2017). "[T]he parties remain bound by the appropriate objective definition of the words they use to express their intent," *In re Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir. 1996), and not the "parties' subjective understanding of the language." *U.S. v. State of New Jersey*, 194 F.3d 426 (3d Cir. 1999).   "[A] provision in a decree is ambiguous only when, from an objective standpoint, it is reasonably susceptible to at least two different interpretations." *U.S. v. State of New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999).

## III.   Discussion

### A.   The Proper Construction of the Consent and Final Judgment

As a threshold matter, I note that Liberty seeks to frame the issue in a way that is not easily reconciled with the language of the Judgement and Consent.   The trigger for the SEC's right to seek reinstatement of the judgment is set forth in two contiguous sentences in both the Judgment and Consent.   The SEC is permitted to petition the Court for relief if:

> "… the Commission obtains information indicating that Defendant's representations to the Commission concerning his assets, income, liabilities, or net worth were *fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made* …"

And when resolving any such petition,

> "… the only issue shall be whether the financial information provided by the Defendant was *fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made*."

14

(emphasis added to duplicate phrasing). The implied premise of Liberty's argument appears to be that these provisions define two different things.   In his view, any "representations concerning his assets, income or liabilities" under the first clause are separate from the "financial information" referred to in the second clause.   If one accepts such a distinction, any specific misleading or incomplete representations under the first clause can then be ignored so long as the summary supplied, *i.e.*, "financial information," accurately sets forth his net worth.   He thus argues that the SEC must do more than prove a material misrepresentation in the course of their negotiations. Instead, "[t]o reopen the final judgment, the SEC must therefore prove an **increase** in the total amount of Mr. Liberty's previously disclosed **assets or income** that would have had a material effect on his ability to pay given his negative $29M in net worth as of July 16, 2009."  Liberty Br. at 14 (emphasis in original), ECF 173.   Elsewhere, he characterizes the issue as one of "insolvency."  *See, e.g., id.* at 2.  Presumably, he frames the issue this way to focus attention away from the substantial evidence in the record that Xanadu was, contrary to his incomplete and misleading representations, not simply an asset of his children, or an asset of minimal or no value, but rather a highly active entity through which he was moving millions of dollars.  Framing the issue in such a way also supports his narrow approach to materiality—that nothing should have mattered to the SEC aside from its ability to collect.

This approach is inconsistent with both the language and the structure of the agreements. Read naturally, the word "financial information provided by the Defendant" is a shorthand reference back to the more specific "Defendant's *representations* … concerning his assets, income, liabilities, or net worth."   The first sentence establishes the SEC's right to file a petition.   The second sentence directly follows the first, and begins by specific reference back to it: *"[i]n connection with any such petition,* the only issue shall be whether the financial information

supplied was "fraudulent, misleading, inaccurate, or incomplete … ." (emphasis added).  In short, the second sentence does not introduce a different standard, but makes clear that there is but a single showing that the SEC must make in any petition it brings under the first sentence.  Aside from doing violence to the plain language, Liberty's approach adds words and requirements that simply aren't present in either document.  Specifically, there is no mention of Liberty's "ability to pay" or insolvency.  In that respect, adopting Liberty's construction of the Judgment and Consent would have the ironic effect of taking language meant to limit the SEC's burden and instead increase it.  Although "in contempt cases … ambiguities and omissions in orders redound to the benefit of the person charged with contempt," *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3d Cir. 1985), Liberty's construction of the order is unreasonable and therefore does not give rise to an ambiguity which must be resolved in his favor, *see Baldwin v. U. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

### B.  Liberty's Omissions and Misrepresentations

To determine whether "Defendant's representations to the Commission concerning his assets, income, liabilities, or net worth were fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made," I begin by looking at the FTI report and what it purports to include.  As an initial matter, there is some ambiguity as to the time frames at issue in the report.  The report's first page caption labels the date as "August 2007 (And May 2008 Update)," with the same title reflected in the cover letter.  The August date makes some sense in light of the August 2007 letter to the Court where it was represented that, "the forensic accountants' initial evaluation [was] near completion and the parties [had] scheduled a meeting to discuss settlement right after Labor Day."  ECF 39.  The May 2008 Update component thus reflects FTI's updating the report to be current up through December 31, 2007, as indicated in the cover

letter.  The section of the FTI report that details what went into the May 2008 Update confirms this.  It both attempts to address whether and to what extent the values of assets or liabilities had changed since the original report, and, more importantly, it identifies materials reviewed for the update including 2007 tax return information, recent statements pertaining to automobiles, and the December 31, 2007 cash balance of "the remaining checking account for which Michael Liberty has signature authority for cash on hand." The SEC has provided sufficient evidence to show that this last statement was false, as FTI did not have access to information on all the checking accounts that Liberty controlled in this way.

As the update statement continued, "[t]hat account in the name of Beverly Hills Investment Partners, LLC ["BHIP"] had a balance of $300,958."  FTI Report at 8.  The report did not mention any review of the Xanadu accounts, which Liberty had only opened in October 2007.  ECF 174-6. In December 2007, Liberty requested via email that Robert Simses, an attorney based in Palm Beach who regularly wired Xanadu large sums of money over the period in question, wire $2.5 million into the Xanadu account.  ECF 174-7.  He requested that Simses "[k]eep this confidential between me and you and peter flanagan" (another attorney at Simses's firm), hiding the account even from Jim Stanley at that point.  *Id.*  He further noted that "I am controlling every dime of flow and need to have it come thru my account." *Id.*  On December 27, 2007, $2.2 million was wired into the Xanadu savings account.[9]  Xanadu Bank Statement (Dec. 31, 2007), ECF 13-1. After debits, which appear to be a mixture of personal and business debits, the combined checking and savings accounts had a December 31, 2007 balance of $935,020.10.  *Id.*  There is no evidence

---

[9] The wire's originator was listed as Louise B. Tollefsen. Louis B. Tollefsen is not otherwise identified as a creditor to Liberty, despite other creditors being listed with details including payee, amount, date incurred, interest rate, collateral, and supporting documents.  In a later email, where Liberty instructs Stanley to bury the Xanadu account to avoid reporting the details of the transaction, he notes that the "money from simses came in dec 29th" into the Xanadu account. ECF 174-10.

in the record that the Xanadu statement for December 2007 was reviewed by FTI in its May 2008 Update despite Liberty controlling and having signature authority over that account, and as discussed below, it soon became his primary operating account for conducting both personal and business affairs.

To be clear, as Liberty repeatedly points out, Xanadu Partners was identified on the May 2008 Update. It was listed as a non-real estate business whose ownership was 100% Michael A Liberty Children's Trust with "comments: Liberty kids." FTI Report Appendix. Xanadu was also identified as a full or partial owner in several other non-real estate businesses, including Beverly Hills Investment Partners LLC ("BHIP"), American Sales & Merchandising Top Model LLC, Rio Grove (California) LLC, and Freeman Angel Films LLC. *Id.*[10] But financial details about the entity were intentionally withheld from FTI and the SEC. Liberty's business partner Jim Stanley was tasked by Liberty "[t]o pull together all the financial information, assets, liabilities, judgments, sources and uses of cash over a period of time … and to explain the business per se to [FTI]." Stanley Deposition (June 1, 2016) 49:3-23. At his deposition, Stanley testified that he "was told not to disclose [Xanadu] to the SEC." *Id.* 46:15-17. The question of disclosing had arisen when Ellis Levin, the FTI director in charge of Liberty's review, was concerned about "why all this money that was going to Mr. Liberty's accounts had gone off to a trickle." *Id.* 47:15-18. This corresponds with the time that Liberty transitioned from using the BHIP account to the Xanadu account as his primary account for making personal expenses. Liberty Dep. 23:21-24:5.[11] Liberty disputes Stanley's testimony, claiming that Stanley "asked about getting the statements from

---

[10] Only one of these entities, Xanadu Partners included, was listed as having any income, assets, liabilities, or capital, and that was Rio Grove (California) which was listed as having an income of $543,067 in 2006, with no other financial details. *Id.*

[11] Liberty maintained in his deposition that the transition from BHIP to Xanadu was a result of getting full custody of his son Riley. Liberty Dep. 29:25-30:5.

[Liberty's wife] and she provided them so he could provide them to FTI," *id.* 66:10-13, and that he instructed Stanley "to provide anything and everything that was asked for," *id.* 66:19-22. Yet Liberty's testimony on this point is plainly contradicted by his emails. Most notably, in March 2008, when Stanley was "going to lock [himself] in today to work on the SEC shit," in preparation for the FTI report, he requested that "Brit send [him] a list of all disbursement from Xanadu for Dec and Jan." ECF 174-10. Liberty decided against it, responding "Why? Xanadu. The money from [S]imses came in dec 29th and is irrelevant as it is a loan? We do not want to go down that road at all. All the activity was very year end and it all was on behalf of American housing etc. Prepaids, taxes, 401k, ins, legals etc. Let's discuss." *Id.* Stanley acquiesced, indicating that he could treat all the money that Xanadu transferred to other Liberty entities as an offset against the wires that came to Xanadu, with any outstanding amounts just being attributed as 1099 income to either Liberty or his children. *Id.*

Liberty's efforts to hide information from FTI and the SEC was not limited to Xanadu. The evidence shows that Liberty was more generally interested in hiding details of his mixed personal and business spending from the SEC, starting with BHIP and ending with Xanadu. Failure to disclose BHIP does not form the specific basis for this petition, but, as the precursor to Xanadu, it is nonetheless significant. Although the existence of the BHIP account and an end of 2007 balance of that account were eventually made known to FTI, Liberty instructed Stanley to withhold BHIP bank statements from FTI. Specifically, on May 21, 2008, Stanley reported to Liberty that "I am wrestling with [FTI's] ongoing request for BHIP bank statements. I am hoping that they will just go to the SEC without them." ECF 174-11. Liberty confirmed this tack along with his contempt for FTI and the SEC, stating "Thanks. Ropadope an they'll forget about them anyway." *Id.* Liberty argues that the "BHIP LLC account was explicitly disclosed to the SEC as

part of the FTI-prepared analysis." Liberty Reply at 4.  This is partially true.  While the existence of the BHIP account was disclosed to the SEC through FTI, Liberty does not point to anything in the record to rebut this evidence that the bank statements were not disclosed in a timely fashion. The result of this delay was that FTI did not have the opportunity to thoroughly review them in preparation for its report or to compare the income and expenses they showed against those claimed by Liberty.[12]  Indeed, the FTI's May 2008 Update notes that the "general updating process included … "[r]eviewing the December 31, 2007 *balance* of the remaining checking account for which Michael Liberty has signature authority for cash on hand.  That account in the name of Beverly Hills Investment Partners, LLC had a balance of $300,958."  FTI Report at 8 (emphasis added).  Necessarily, a balance is just a snapshot in time.  It does not reflect the considerable underlying flow of funds entering and leaving the account.  Based on the SEC's review of the BHIP account statements, which it was only able to obtain via a third-party subpoena in the present litigation, Liberty concealed over $5.7 million of receipts with coordinate spending from January 2006 to May 2009. BHIP Statements, ECF 174 Ex. 17.  Liberty also concealed from this time period the statements of another credit card issued by Chase Bank, which he also failed to produce

---

[12] The evidence suggests that Stanley belatedly capitulated on the BHIP statements.  On June 3, 2008, he wrote to FTI to explain some "deposits you see coming into BHIP in October."  ECF 173 Ex. 19. But the delay is significant. Given that the update was being completed in May 2008, Liberty's later claim that "FTI spent a considerable amount of time and resources analyzing, among other transactions, the BHIP LLC checking account statements to determine the nature of each transaction (asset, income, or liability), what was attributable to Mr. Liberty personally (and therefore reflected in the analysis), and what was attributable to businesses he was associated with (and therefore not necessarily included)" is unsupportable on its face. Liberty Br. at 19.  This is especially the case in light of the overwhelmingly complex admixture of personal and business affairs that Liberty conducted through the BHIP and then Xanadu accounts. Liberty cites nothing in the record to establish that FTI reviewed the BHIP monthly account statements in sufficient time to incorporate them into a meaningful analysis in May 2008 against the clear evidence that he was actively hiding those statements.  Instead, he simply points out a mathematical fact that the $1,943,314 "Total Sources" value listed on a 2007 Summary of Sources and Uses of Cash item included in the FTI report, ECF 83-3 at 23, is less than the total value of deposits, claimed to be $3,627,943, made to the BHIP checking account based on bank statements produced for the present litigation, ECF 173, Ex. 27.

for this litigation.  Liberty Dep. 182:1-25; 184:21-185:6; Brittany Liberty Dep. (Apr. 5, 2018) 28:16-29:1, ECF 173-1, Ex. 10.[13]

Where the FTI could affirm that it reviewed statements, it did so.  It did not make such an affirmation as to the BHIP account.[14]  Indeed, when identifying the sources of information for the original report conducted in August 2007, FTI indicates that it was limited to reading litigation documents (including SEC questionnaires and complaints as well as documents regarding his debt from other actions), tax returns from 2003, 2004, and 2005, "[l]ists of Liberty's sources and uses of funds for 2004, 2005, 2006," Liberty's web sites, and interviews with Liberty, Jim Stanley, and another associate of Liberty's.  FTI Report at 1.  The only statements provided to FTI, as noted in the May 2008 Update, were limited to those for accounts that would show liabilities, such as his auto, insurance, and mortgage accounts. *Id.* at 8. In short, except for litigation documents from Liberty's past, all the documents reviewed by the FTI that might disclose Liberty's expenses or income appear to have been based on Liberty's self-reporting which, as discussed above with regard to Mozido and the 2005 loan application, is notoriously duplicitous.

Discovery in support of this motion establishes that by May 2008 around $3.4 million in credits were made to the Xanadu accounts and around $3.2 million were debited from those accounts (both figures excluding internal transfers between the checking and savings accounts), such that Xanadu had at this time largely "replaced the BHIP LLC checking account with an

---

[13] Both Liberty and his wife Brittany identify the Chase card as associated with Xanadu in some capacity.  However, at the time, Xanadu's accounts appear to have principally been with Bank of America. The BHIP account, which continued to exist with much lower usage, was at Washington Mutual, which was purchased by JP Morgan Chase, at which point in October 2009, the BHIP checking account statements became printed under Chase's name.

[14] Notably, where FTI was provided statements for accounts for the May 2008 update, such as auto, insurance, and mortgage accounts, it explicitly stated that it reviewed the "statements," in contrast to the BHIP account for which it only reviewed the single-month "balance."

account in the name of Xanadu." Liberty Reply at 5. FTI did not review any statements from the Xanadu account for its May 2008 Update. Based upon the information provided by Liberty and his agents, FTI's report only included Xanadu as an entity which was owned by a trust benefiting Liberty's children and which had no value to Liberty. Liberty claims that "[o]n June 3, 2008, Mr. Stanley informed FTI (via email) that Xanadu 'replaces the LLC's previously used.'" Liberty Br. at 19. But this email is hardly exculpatory. To the contrary, it deliberately obscures that Xanadu was becoming or already had become Liberty's primary personal spending vehicle. The response in full reads "Xanadu is a trust established at the time of this transaction, for the benefit of the four Liberty kids, and replaces the LLC's previously used. The trust was set up on counsel's advice (estate planning, and with Riley Liberty now in the picture)." ECF 173, Ex. 19. This response is misleading in that it creates the impression that Xanadu was an entity benefiting Liberty's children, when it in fact it was intensively used for Liberty's personal and business affairs. The response makes vague reference to "LLCs previously used." It does not identify BHIP as the predecessor entity that was "replaced" by Xanadu, which likely would have enabled FTI to identify that Xanadu was now Liberty's operational account. At the end of 2008, Liberty was aware that, because of his misrepresentations and omissions to FTI, the information that the SEC had did not include detailed information about the use of Xanadu's accounts. In an email exchange on December 31, 2008, Liberty and Stanley show their awareness of the significance of all this. As they are trying to make Xanadu the assignee of a note involving other Liberty businesses, they seriously consider the implications of the transaction for the SEC's knowledge of Xanadu. Liberty notes, in a half thought, "Hence why I asked for it to be assigned and the SEC." ECF 174-12. Stanley points out that some of the other parties aren't the ones that "have a problem … The SEC is a whole different matter. They will probably want to know who Xanadu is, and then […]." *Id.*

To summarize, Liberty's own communications confirm that he sought to hide Xanadu in the first instance.  He then disclosed it belatedly.  And he disclosed it in a way meant to obscure its significance, with a description that was both vague and misleading.  Moreover, he never disclosed the substantial sums of money that had washed through its accounts, much of it through use of credit and debit cards.  I find such evidence to be clear and convincing in showing that Liberty's representations to the SEC concerning his assets, income, and liabilities related to Xanadu were, at best, misleading and incomplete.

### C.  Liberty's Arguments Concerning Xanadu's Nominal Owners and Business Uses

In addition to Liberty's defenses noted above, Liberty's brief includes a consistent theme that his failure to disclose details regarding the Xanadu accounts was not "fraudulent, misleading, inaccurate, or incomplete" because Xanadu was nominally owned in some form of trust for his children and the majority of credits and debits through the account related to business transactions. Liberty Br. at 20-21; Liberty Reply at 5-6.  As the SEC correctly points out, the relevant assets for determining the pool of funds available to pay a disgorgement judgment includes assets that a defendant has a beneficial interest in or control of, including assets that are jointly owned.  *See S.E.C. v. Bilzerian*, 112 F.Supp.2d 12, 24-26 (D.D.C. 2000), *aff'd*, 75 Fed. Appx. 3 (D.C. Cir. 2003); *see also S.E.C. v. Solow*, 682 F. Supp. 2d 1312, 1327-29 (S.D. Fla. 2010), *aff'd,* 396 Fed. Appx. 635 (11th Cir. 2010); *S.E.C. v. Yun*, 208 F. Supp. 2d 1279, 1284 (M.D. Fla. 2002).  The district court's opinion in *Bilzerian* is particularly instructive.  In that contempt proceeding, the defendant argued impossibility as a defense to the SEC's enforcement of a $62 million disgorgement order.  112 F.Supp.2d at 17.  There the defendant had "transferred his substantial assets into a complex ownership structure of off-shore trusts and family-owned companies and partnerships." *Id.* at 18.  The Court concluded that it could "consider all potential sources of funds

available to Bilzerian, including jointly-owned assets." *Id.* at 25 (citing *Hodgson v. Hotard,* 436 F.2d 1110, 1115–16 (5th Cir.1971)).  It further found that the defendant's "beneficial interest in or control over" putative family trusts was relevant to the determination of his ability to pay.  *Id.* at 25-27.

Although the facts of *Bilzerian* were different, the legal principle in play is the same. Michael Liberty, by his own admission, used the Xanadu accounts "to receive loan proceeds, which, as Mr. Stanley confirmed, paid 'for various personal and business activities.'"  Liberty Reply at 5 (quoting Stanley Dep.).  Having used Xanadu in that way, Liberty cannot rely on the failure to keep regular records as a shield against legal responsibility.  Indeed, Liberty's decision not to track such accounts fits with his general modus, wherein he intentionally mixed his personal and business accounts "[b]ecause [he] was trying to pursue new business opportunities and [he] had judgment creditors and … [his] credit was impaired because of … [his] financial status." Liberty Dep. 24:15-20.  That is, Liberty regularly mixed his personal and business accounts to create the false pretense that his personal assets were unreachable business assets.[15]  In Liberty's own words in December 2007, in an email captioned "Xanadu Partners Wiring Instructions," Liberty states that he was "controlling every dime of flow" through the Xanadu accounts.  ECF 174-7; *see also* Liberty Dep. 46:22-48:2 (describing his personal control of Xanadu's investments); Liberty Dep. 62:1-8 ("A. Again, I borrowed the funds … from various investors.  Q. When you

---

[15] Besides providing a shield against his creditors, *see* Liberty Dep. 24:15-20, Liberty's mixing of personal and business interests in the same account also allowed him to generate loans that he could use to pay off his personal bills. Liberty Dep. 24:23-25:7 ("Q. Then why was your money not in your personal bank account? A. I didn't have any money. I was borrowing money to pursue new opportunities. Q. So you were borrowing money from Xanadu? A. From real estate partnerships that I had … I was borrowing against them, and using Xanadu, as an investment vehicle on behalf of my children, pursuing new opportunities."); *id.* 25:23-26:6 ("Q. Did investors know that you paid personal expenses out of Xanadu? A. Yes. Q. Did any investors ever express concern about how much your personal expenses were? A. No. Q. Did anyone other than you approve the personal expenses. A. I don't recall.").

say 'you,' do you mean Xanadu? A. Yes. … I apologize.  When I say 'I,' I mean the entity.").  And Liberty actively used these accounts to pay for his personal expenses.  Liberty Dep. 23:21-24:20.[16]

I therefore conclude that the Xanadu accounts are appropriately considered financial interests of Liberty that were subject to disclosure despite any familial beneficiaries or business uses those accounts may have also been related to.

D.  Materiality Standard

Liberty's materiality argument depends on his contrived interpretation of the Consent and Final Judgment.  As set forth above, he attempts to redefine materiality in the context of the Final Judgment so that it merely "concerns facts that would have affected his ability to pay." Liberty Br. at 14.  The SEC stands by the traditional understanding of materiality in the context of representations, an objective test of "whether a reasonable man would attach importance [to the statements] in determining his choice of action in the transaction in question." SEC Reply at 4 (quoting *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 408 (3d Cir. 1973)).

The Third Circuit has largely turned to the common law understanding of materiality when addressing the standard applicable to representations made between parties in various contexts, including misrepresentations made to government agencies.   The SEC cites two of these cases. First, in *Rochez Bros., Inc. v. Rhoads*, 491 F.2d 402 (3d Cir. 1973), the Third Circuit considered the buyout between two owners of a closely held company where the buyer withheld from the seller information about offers by third parties to purchase the company.  *Id.* at 405-406.  There

---

[16] The SEC also points out that the Federal Debt Collection Procedures Act, permits the government to access debtor assets that the debtor isn't reporting as income in order to avoid garnishment. 28 U.S.C. § 3204(a)(2). It is not clear that this statute applies to the case in its present posture. Specifically, Liberty does not appear to be or have been a judgment debtor under the act.  However, the SEC's suggestion is well taken that, based on the analysis contained in *Chao v. Vidtape, Inc.*, CV-98-3359(ETB), 2004 WL 203008 (E.D.N.Y. Jan. 30, 2004) which quotes Hon. James J. Brown, *Judgment Enforcement* § 5.03[D] at 5–15 (2d ed.1999), Liberty's use of Xanadu as a family business to pay his personal expenses without paying him a formal salary would likely be deemed a source of imputed income.

was evidence that the seller's awareness of those negotiations may have influenced the seller's willingness to sell to the buyer at the decided price and were thus material to the transaction at issue. *Id.* at 410-411. Regarding materiality, the Third Circuit held that "[t]he test of the materiality of undisclosed or misrepresented facts is basically an objective one— i.e., whether 'a reasonable man would attach importance (to them) in determining his choice of action in the transaction in question.'" *Id.* at 408 (quoting *List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir.), *cert. denied*, 382 U.S. 811 (1965)).[17]

The SEC also cites *United States v. Saybolt*, 577 F.3d 195 (3d Cir. 2009), where the Third Circuit addressed materiality in the context of fraudulent claims submitted to the IRS in violation of 18 U.S.C. §§ 286 and 287. Because the statutory language did not include the express term "material," the *Saybolt* Court had to determine whether the statutory provisions implicitly incorporated a materiality standard. It did so with respect to § 286 only, noting: "Where, as here, the alleged conspiracy involves the making of false statements or representations, the conspirators must have agreed to make statements or representations *that would influence the Government's decision* on whether to pay a claim. Such statements or representations are, by definition, material." *Id.* at 202-03 (emphasis added). The Third Circuit cited two sources for this definition of materiality. First, it cited a Supreme Court case construing a statute that forbid false statements

_____

[17] Of further note, following the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128 (1972), the Third Circuit held that in cases of non-disclosure under Rule 10b-5, the materiality and reliance requirements were collapsed, such that a plaintiff could establish causation by establishing materiality, and the burden then shifted to the defendant to prove non-reliance in order to defeat this presumption of causation. *Rochez Bros.*, 491 F.2d at 410. While the present matter does not arise under Rule 10b-5 determination, it is in some ways analogous. The Final Judgment made clear that the remedies and penalties were suspended "[b]ased on Defendant's sworn representations in his financial Declaration and other documents and information submitted to the Commission," and that those penalties could be reimposed if any of those representations were "incomplete in any material respect." Final Judgment § IV. By further providing that the "only issue" is whether there was a material misrepresentation, the Judgment itself eliminates any additional burden that the SEC might otherwise have had to prove an element of causation.

to banks.  There, the Supreme Court understood materiality to mean "having a natural tendency to influence, or being capable of influencing, the decision of the decision-making body to which it was addressed."  *U.S. v. Wells*, 519 U.S. 482, 490 (1997) (quoting *Kungys v. U.S.*, 485 U.S. 759, 770 (1988).  In *Kungys*, the Supreme Court cited a series of cases that adopted a similar standard, noting that "[t]he federal courts have long displayed a quite uniform understanding of the 'materiality' concept as embodied in [statutes regarding false statements made to public officials]." *Kungys v. U.S.*, 485 U.S. at 770.

 In addition to this reliance on Supreme Court precedent, the Third Circuit also quoted the Restatement (Second) of Torts § 538, which states that a representation "is material if:

> (a) a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question; or
>
> (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it."

*Saybolt*, 577 F.3d at 203.  Citation of the Restatement comports with the discussion in *Kungys*, which expressly noted the incorporation of a common law definition of materiality into federal statutes with an implied a materiality requirement.  *Kungys v. U.S.*, 485 U.S at 770.  Nothing in the Consent and Final Judgment warrants departure from the standard of materiality employed by the Supreme Court and the Third Circuit in cases involving misrepresentations, which is a standard expressly derived from the common law.

I am unpersuaded by the cases cited by the defense in reply.  *Quinn v. Fishkin*, 3:14-CV-1092 (AWT), 2016 WL 2944540 (D. Conn. Apr. 22, 2016), involved a settlement agreement that was conditioned on the "material accuracy of the financial statement."  *Id.* at *3.  After a bench trial, the presiding judge made a number of highly specific factual findings based on the record, but nothing in the analysis there changes my assessment of the record here.  A second case,

*Promotion in Motion v. Kenny's Candy Co.*, Civ. No. 97-3512, 1999 U.S. Dist. LEXIS 22173, involved an allegation of fraud related to the formation of a settlement agreement which did not include any express condition regarding any financial information or representations to the other party. *Id.* at *10-11. Rather, it involved a litigant who took a posture of financial penury during settlement negotiations in order to drive a lower payment which, long after the fact, the opposing party realized was simply a bluff. *Id.* at *12-13.[18]

Liberty's narrowing of the materiality standard essentially seeks to reduce the SEC's offer to him as premised entirely and exclusively on his ability to pay as a measure of his purported total solvency. The Consent and Final Judgment notably did not include any express reference to Liberty's solvency, net worth, or ability to pay. Liberty's preferred standard doesn't account for other conditions that the SEC may have considered important, if not critical, to its offer to suspend full enforcement of potential penalties against Liberty including, crucially, that Liberty would be forthright in his disclosures regarding his financial information. The significance and underlying motivation of Liberty's efforts to obscure Xanadu and the details of BHIP from the SEC is demonstrated by the profligate nature of personal spending revealed by later discovery. This included spending tens of thousands of stolen dollars on college football tickets, ECF 176-13

---

[18] Liberty also cites *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), for the proposition that "materiality in the securities context focuses on whether omission would have 'significantly altered the total mix of information made available.'" Liberty Br. at 14 (quoting *Basic Inc*, 485 U.S. at 231-32). *Basic Inc.* involved material misrepresentations to the general public that impacted investors on a securities exchange. The Court's use of the phrase "total mix of information" reflected its cognizance that investors in public securities are sophisticated actors who balance a large amount of information of various types in order to decide that one particular security meets their portfolio needs better than any other particular security at a given moment. *See id.* at 233-235. Before discussing that more specific definition of materiality, the *Basic Inc.* Court recognized that the overarching test was that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Such an approach is aligned with the SEC's proposed standard here that "[t]he test of materiality of undisclosed or misrepresented facts remains an objective one—i.e., whether 'a reasonable man would attach importance [to them] in determining his choice of action in the transaction in question.'" SEC Reply at 3-4 (quoting *Rochez Bros.* 491 F.2d at 408).

($30,000); tens of thousands of dollars at luxury hotels such as the Beverly Hills Hotel, the St. Regis, and the Mandarin Oriental, ECF 174, Ex. 13; exorbitant payments made to ex-wives and ex-girlfriends, ECF 176-7, 176-11 ($96,000 annually plus $70,000 for "renovation project" and $75,000 for a car to Tracey Bennett); ECF 176-9, 174 Ex. 13 ($750,000 for "house [he] buil[t] for Gail [Liberty]," with over $450,000 in wires traceable to Gail Liberty); and thousands of dollars per month (sometimes over ten thousand dollars per month) spent by his current wife on limousine services, ECF 174, Ex. 14. Significantly, over $33,000 and $45,000 of personal spending was transacted through the Xanadu credit card in May 2009 and June 2009, respectively, just as the contemporaneous June 2009 Statement of Financial Conditions was being provided to the SEC. ECF 174, Ex. 14. The SEC also points out that the statements from the concealed accounts reveal that Liberty controlled a much greater amount of funds than it understood based on his disclosures, and that this knowledge would have been material to its determination. SEC Reply at 4. Liberty's intentional efforts to withhold information from the SEC conclusively shown through his emails, the certain effect those efforts had on the abilities of FTI and the SEC to assess the accuracy of Liberty's financial disclosures, Liberty's extravagant spending that was concealed in those accounts, and the extensive amounts of funds that Liberty controlled through those accounts are all separate and independent factors that a reasonable person would have attached importance to in offering Liberty a suspension of the disgorgement and other civil penalties for his role in the pension-fund scheme. Taken together, their materiality is overwhelming.

As a variation on this materiality argument, Liberty contends that the SEC has failed to show that Xanadu was used differently than the BHIP accounts or that the concealed transactions reflected assets or liabilities out of line with the January 2009 Statement or the June 2009 Statement, such that its omission was in any way misleading. Liberty Br. at 18-20; Liberty Reply

at 5-7.  Liberty makes this argument on the basis that the 2009 update did not require him to provide "any transaction level detail." Liberty Br. at 22.  In effect, he argues that because he successfully withheld and delayed production of relevant documents that crippled FTI's ability to accurately assess his financial information in 2007 and 2008, his limited 2009 affirmation that there were no material changes to his financial conditions cannot be deemed misleading.  Such an argument cannot withstand serious scrutiny.  The 2009 Supplemental Declaration also includes a sworn affirmation that "[t]he attached documents, to the best of my knowledge, information, and belief, provide a complete and accurate depiction of my financial situation as of December 31, 2007."  It also attached the January 2009 and June 2009 Statements which affirmed that he had "no assets, owned either directly or indirectly, or income of any nature other than as shown in, or attached to, this statement," which was untrue.  And in any case, the suspension of disgorgement and penalties of the Consent and Final Judgment was not solely contingent upon the sworn statements in his Supplemental Declaration or the SEC form Financial Statements.[19]  Rather, the Consent and Final Judgment was conditioned on any and all representations provided by the Defendant and made to the Commission directly or indirectly that were "fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made."

E. Remedy for the Violations

As a remedy for Liberty violating the Consent and Final Judgment by making misrepresentations concerning his financial information to the SEC, the SEC seeks "that the Court reinstate the full amount of Liberty's unpaid disgorgement and pre-judgment interest, $5,356,335, plus post judgment interest accruing since June 9, 2010, for a total of $5,479,643.71."  SEC Br. at

---

[19] The SEC is not at this point bringing an action to enforce a charge of perjury against Liberty pursuant to 28 U.S.C. § 1746 or 18 U.S.C. § 1001.

14. The SEC also "asks the Court to now enter a civil penalty against Liberty in addition to reinstating the full disgorgement owed." *Id.* In Liberty's consent to final judgment, he waived any opportunity to: (1) "assert that payment of disgorgement, pre-judgment or post-judgment interest, or a civil penalty should not be ordered;" (2) "contest the amount of disgorgement or pre-judgment or post-judgment interest;" or (3) "contest the imposition of the maximum civil penalty allowable under the law," or (4), "assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense." Consent ¶ 3, ECF 64; *see also* Final Judgment § IV, ECF 65.

The parties agreed to the total disgorgement figure as a reasonable approximation of profits in the Consent and Final Judgment. As part of entering the Consent and Final Judgment, Liberty has waived any right to "contest the amount of disgorgement or pre-judgment or post-judgment interest." Consent § 3, ECF 64; *see also* Final Judgment § IV, ECF 65. I therefore find it appropriate to reinstate the full amount of Liberty's unpaid disgorgement and pre-judgment interest, $5,356,335, plus post-judgment interest accruing since June 9, 2010.

With respect to civil penalties, the SEC originally brought this action pursuant to, among other statutes and regulations, the Securities Act of 1933, 15 U.S.C. § 77q(a), and the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The provisions regarding civil penalties in the respective enforcement provisions of these statutes are essentially the same. *Compare* 15 U.S.C. § 77t(d)(2) *with* § 78u(d)(3)(B). In both of these statutes, "(I) if the violation … involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; *and* (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," the amount of penalty is subject to third-tier penalties. § 77t(d)(2)(C); *see also* § 78u(d)(3)(B)(iii). "[T]he amount of penalty for each such [third-tier]

violation shall not exceed the greater of (i) $100,000 for a natural person … or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.*  Pursuant to the SEC's authority under the various acts, the Commission has increased the maximum, per violation penalties available in the relevant time period to $130,000 per violation. 17 CFR § 201.1001.  The statute grants the district court the jurisdiction "to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." § 77t(d)(1); *see also* § 78u(d)(3)(A). Review of the district court's decision is subject to an abuse of discretion standard.  *See S.E.C. v. Sargent,* 329 F.3d 34, 38 (1st Cir. 2003); *see also S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997) (reviewing disgorgement determination in SEC enforcement action); *S.E.C. v. Lazare Industries, Inc.*, 294 Fed. Appx. 711, 714 n.2 (3d Cir. 2008) (non-precedential) (citing *Sargent*).

The allegations of the complaint detail a perverse and extensive fraud directed by Liberty to swindle $27 million from a private venture capital fund whose primary investors were public pension funds including the City of Philadelphia Board of Pensions and Retirement and the Pennsylvania Statement Employees Retirement System.  At least $4 million of these diverted funds went to Liberty's direct, personal benefit.   Because the Complaint's allegations involved significant "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the $27 million of losses suffered by the investors in the fund as a direct result of Liberty's conduct were "substantial losses," I conclude that the third-tier limit of civil penalties applies.

Courts have utilized a variety of metrics for quantifying the number of violations relevant to the assessment of a civil penalty.  Some courts have assessed a penalty for each individual investor defrauded in a scheme.  *S.E.C. v. Kenton Capital, Ltd.*, 69 F.Supp.2d 17 n.5 (D.D.C. 1998)

(twelve investors); *S.E.C. v. Secure Capital Funding*, CIV. 11-916, 2014 WL 936722 (D.N.J. Mar. 10, 2014) (four investors). In the present case, this would come out to approximately $4.29 million based on the SEC's allegations of 35 investors in Keystone V, minus two companies controlled by Liberty. Complaint ¶ 26. Other courts have assessed a penalty based on every misrepresentation made by the defendant. *See SEC v. Coates*, 137 F.Supp.2d 413, 428-30 (S.D.N.Y. 2001). Such an assessment would be difficult to make on the basis of the Complaint. One approach would be to assess the penalty on each individual investment made pursuant to the fraud, of which there are at least six detailed in the Complaint plus an additional four that flow out of the original investments, plus the fraudulent settlement agreement, plus perhaps Liberty's two companies that were made limited partners and afforded him a seat at the advisory board despite failing to make any capital contributions. This would result in a penalty of $1.69 million. But it would risk undercounting the possible violations in light of Liberty's on-going and systematic involvement with the scheme, his participation on the advisory board, and any acts he may have taken to conceal the scheme that were never fully revealed given the action's settlement prior to the development of an evidentiary record.

Where courts have found "the exact number of violations … difficult or impossible to determine," they have instead used the gross pecuniary gain value permitted by the statute as an appropriate measure for civil penalties. *S.E.C. v. Graulich*, 2:09-CV-04355 WJM, 2013 WL 3146862, at *7 (D.N.J. June 19, 2013) (ordering a $5.6 million penalty equal to the disgorgement amount); *see also SEC v. Invest Better 2001*, No. 11427, 2005 WL 2385452, *5 (S.D.N.Y. May 4, 2005) (ordering civil penalty equal to disgorgement amount because "the exact number of violations ... is impossible to determine"). I find a penalty reflecting the gross pecuniary gain is appropriate given the difficulty of assessing the number of individual frauds committed by Liberty,

and the serious nature of the conduct and harms alleged.  I note that the $4,049,000 in civil penalties based on the disgorgement value is actually lower than the amount calculated on the per investor metric above.  I also note that the disgorgement value only reflects the $4 million that was directly attributable to Liberty, where the Complaint reflects over $27 million dollars of harms inflicted on the pension funds as a result of Liberty's conduct.  Although not all of that $27 million was directly converted to Liberty's use, all or almost all of it was transferred at Liberty's direction into investments in which he also had a stake or at the very least some personal advantage to be gained from the investment.  I will also award post-judgment interest on the civil penalty.

## IV.    <u>Conclusion</u>

For the reasons set forth above, I find by clear and convincing evidence that Defendant Michael Liberty is in contempt of the Consent and Final Judgment.  SEC's motion to reinstate the previously suspended disgorgement with post-judgment interest and to impose a civil penalty against the Defendant will be granted.  An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge