**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 06-1030** |
| | : | |
| **MICHAEL A. LIBERTY, et al.** | : | |

**McHUGH, J.**                                                              **May 25, 2022**

## <u>MEMORANDUM</u>

Defendant Michael Liberty moves under Rule 60(b) for relief from my recent Order finding him in contempt for violating a prior consent order issued by this Court. The contempt order was issued in favor of the Securities Exchange Commission, related to its investigation of Liberty for securities violations. He now alleges that the SEC engaged in misconduct when it opened its contempt investigation more than five years ago, because the witness alerting the SEC to Liberty's deceptions had access to ostensibly privileged documents and information, and the SEC's alleged reliance on that witness and the information he provided constitutes "a fundamental miscarriage of justice." For the reasons that follow, I find Liberty's arguments untimely and speculative at best. They do not meet the rigorous legal standard for relief required by Rule 60(b), and Liberty's motion will therefore be denied.

### I.    <u>Legal Standard</u>

Liberty seeks relief under Rule 60(b)(3) and Rule 60(b)(6). "The movant under Rule 60(b) bears a heavy burden," as Rule 60(b) motions are a form of "extraordinary relief which should be granted only where extraordinary justifying circumstances are present." *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991) (cleaned up).

Rule 60(b)(3) permits the Court to relieve a party from a final judgment or order where there was fraud, misrepresentation, or misconduct by an opposing party.  "To prevail, the movant must establish that the adverse party engaged in fraud or other misconduct, and that this conduct prevented the moving party from fully and fairly presenting his case." *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983).  The burden is on the moving party to establish this by clear and convincing evidence. *Brown v. Pennsylvania R. Co.*, 282 F.2d 522, 527 (3d Cir. 1960).

Rule 60(b)(6) has an even broader scope and permits the Court to grant relief from a final judgment or order for "any other reason that justifies relief," besides those listed in Rule 60(b)(1)-(5). Despite its breadth, under Rule 60(b) such relief "may only be granted under extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140 (3d Cir. 1993).

## II.   <u>Procedural Posture</u>

This long-running civil litigation originally concluded in 2010 with a consent judgment against Liberty related to a $27 million scheme to defraud a venture capital fund that principally serviced public pension funds.[1]  Under the terms of the consent judgment, Mr. Liberty paid a modest percentage of his overall liability based upon his representations about his ability to pay any higher amount. In September 2016, the SEC petitioned the Court to enforce the consent judgment and find Liberty in contempt based upon misrepresentations about his assets, ECF 83. Lengthy litigation before Judge Dubois followed.  After this case was reassigned to me, I ordered final briefing, and, in March 2022, granted the SEC's petition finding Mr. Liberty in contempt. ECF 180.

---

[1] The facts underlying the substantive legal violations are recounted in the opinion granting the SEC's petition for contempt. *Sec. & Exch. Comm'n v. Liberty*, ECF 180, No. CV 06-1030, 2022 WL 685536 (E.D. Pa. Mar. 7, 2022).

III.  **Discussion**

The underlying factual predicates for Liberty's motion are the same whether considered under either 60(b)(3) or 60(b)(6).  Liberty argues that the SEC committed misconduct in receiving and using materials from five years ago as to which Liberty has recently decided to assert claims of privilege.  The materials and the underlying dispute span at least the life of this litigation and parallel civil litigation in the United States District Court in Maine, in which the SEC has alleged Liberty used an entity known as Mozido to defraud investors.  *SEC v. Liberty*, No. 18-cv-139 (D. Maine).[2]

The parties do not dispute that the SEC initiated this case at least in part based on deposition testimony from Liberty's former business partner Jim Stanley that was taken *ex parte* during another investigation concerning Liberty.  *See* SEC Petition at 6, ECF 83.  According to Liberty, the SEC's use of Stanley's deposition as a basis for further investigation into whether Liberty lied to the SEC in obtaining the original consent was "an unholy reliance" because the topics explored by the SEC Stanley in Stanley's deposition "directly related to, and were clearly derived from, the very subject matters" contained in documents which may have been privileged.  Liberty Br. at 7-9, ECF 183.  Stanley had originally obtained some of these documents through discovery in a private arbitration with Liberty in 2013 where the parties agreed that Liberty would not waive any

---

[2] The underlying discovery disputes in the Maine litigation also implicate the criminal investigations and prosecutions of Liberty's various frauds, as some of the documents may have been produced to the Maine SEC litigation team through a DOJ team, though the exact path the documents took, and which teams of lawyers were involved in their production is unclear from the record and not properly before the Court.  The relevant criminal prosecutions include *United States v. Liberty*, No. 2:16-cr-144 (D. Maine Nov. 28, 2016) (using Xanadu to shield illegal contributions to President Trump's election campaign, per Sentencing Transcript, ECF 31) and *United States v. Liberty*, No. 2:19-cr-30 (D. Maine Feb. 27, 2019) (selling fraudulent notes to invest in Mozido).  Liberty pleaded guilty and was sentenced in the 2016 criminal action, and he was granted full clemency by President Donald Trump in January 2021. Trial in the 2019 criminal action was pending when he was granted a full pardon by President Trump in January 2021.

right to assert privilege as to the produced documents.  Liberty Br. at 11-15.  The arbitrator expressly avoided ruling on what rights Stanley had to use the documents outside of the proceedings, pursuant to his various former roles in the companies which originally held the privilege.  It seems clear, however, that the private agreement between Stanley and Liberty limited the use of documents produced by Liberty to Stanley and required Stanley to destroy or return those documents at the conclusion of the arbitration. *Id.*

 Stanley's production of the documents from the 2013 arbitration pursuant to the SEC's subpoena took place in 2016 and included two batches. First, there were the 713 pages of documents, labeled with their own Bates stamp and described by Stanley's attorneys in the production cover letter as containing potentially privileged documents identified by targeted search terms.  Liberty Br. at 7-8.  Second, there were an additional 16,922 pages produced which Stanley's attorneys represented were non-privileged.  In the Maine litigation, Liberty has asserted privilege over most of the 713 pages and some 1,300 documents among the 16,922 other pages.

The timing and manner of the SEC disclosing its possession of these documents is in some dispute. I will address those disputes in a moment, but first note it is not in dispute that, *in this action*, Liberty was informed about Stanley's *ex parte* deposition at least by September 2016 when the original petition for contempt was filed and an excerpt of Stanley's deposition was included as an exhibit. ECF 83-7.  By September 2017, the SEC had provided the complete deposition transcript along with all exhibits used in the deposition.  Email of Chris Thomson (Sept. 6, 2017), ECF 188-1.  From that time until my order granting the SEC's petition in March 2022, Liberty at no point moved in this case for a protective order as to any of these documents, as to any of the

documents I relied upon in deciding the contempt, or as to any portion of Stanley's deposition where the "topics" of FTI or BHIP were discussed.[3]

Liberty's argument appears to consist of the following syllogism:  that (1) the SEC used the 1,300 some documents that Liberty believes are privileged, and "worse … related to the very same subjects" as the 713 segregated pages, to prepare for Stanley's deposition and thereby launder their privileged contents into admissible testimony, (2) based their entire investigation into Liberty's misrepresentations on this illicit evidence, (3) withheld disclosure of their potential access to these documents until January 2022, and  (4) strategically waited to concede they might be privileged in the Maine litigation until I ruled on the contempt petition.  Without specifically identifying any breach of privilege, Liberty challenges the overall validity of the SEC's investigation based on an assumption that the SEC engaged in serious misconduct.  The facts underlying these allegations, pieced together largely from correspondence between counsel over privilege in the Maine litigation, and the docket in Maine, fall well short of clear and convincing evidence that Liberty is entitled to extraordinary relief.

First, Liberty's arguments at this stage are untimely and any claims of privilege in this case are waived. As noted above, in this case Liberty was informed about the Stanley deposition in September 2016 when the petition which attached excerpts from that deposition were filed with the Court.  ECF 83.  He received all the exhibits used in the deposition by September 2017.  ECF 188-1.  At no point before the contempt order was issued did Liberty challenge the admissibility

---

[3] FTI Consulting was the accounting firm that Liberty worked with to review his finances to prove his penury to the SEC during settlement negotiations and from which he intentionally hid and misrepresented certain financial information. BHIP was Beverly Hills Investment Partners, an ostensible business entity through which Liberty conducted most of his personal financial transactions prior to the formation of its successor entity Xanadu.  I found Liberty had purposefully withheld the detailed finances of BHIP and Xanadu from FTI to prevent an accurate accounting of his financial situation.  These details are more thoroughly recounted in the opinion on the SEC's contempt petition.  ECF 180.

of the transcript or the associated exhibits on the basis of privilege. He has therefore waived privilege as to the materials which formed the basis of litigation over the contempt petition. *See Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 187 F.R.D. 528, 530 (E.D. Pa. 1999) ("Even objection that information sought is privileged is waived if not timely stated and it is within the court's discretion to determine whether the privilege has been properly invoked.").

In the Maine litigation in June 2021, he was provided with a number of documents that the SEC possessed, including the now contested documents that Stanley had provided to the SEC in 2016. *See* Liberty's Motion for Protective Order, No. 18-139, ECF 137, at 6 (D. Maine Dec. 7, 2021). On December 7, 2021, he filed for a protective order related to those documents in the Maine action. *Id.* No similar motion was filed here, and Liberty proceeded to file his brief responding to the contempt petition on December 20, 2021, approximately two weeks after raising the privilege issue in the Maine litigation. ECF 173. In his brief, he did not assert privilege or argue that I should withhold ruling because evidence was improperly before me. The sole reference to privilege was in a section of the brief where Liberty argued that the SEC was advancing conflicting positions regarding Mozido's finances in the two parallel litigations. *Id.* at 12-13. There Liberty asserted that the SEC used "hundreds of privileged emails it had received from Mr. Stanley, many of which pertained to Mr. Liberty's financial disclosures to the SEC" to concoct the contradictory narratives. *Id*. In a footnote, Liberty indicated that a motion for a protective order was pending in the Maine litigation which "raise[d] questions as to whether the SEC should be disqualified from those proceedings." *Id.* at 12 n.6. Liberty further contended that he "ha[d] not waived any privilege with respect to these materials." *Id.* Having made these oblique references to privilege, Liberty did not proceed to assert a privilege as to any documents submitted by the SEC in support of its contempt petition. For that matter, he still has not asserted

any privilege as to any documents or testimony used in the present proceedings.[4]   As I noted in

my opinion finding him in contempt, "Liberty does not argue that the materials at issue in the

present motion are implicated in any way by that motion or that these materials are subject to the

claims of privilege apparently asserted in the parallel proceeding." ECF 180 at 7 n.4.  Even if one

were to credit Liberty's most aggressive position – that he lacked sufficient notice until sometime

in January 2022, nothing would have prevented him at that point from interposing an objection

before substantial time and attention were invested by the Court in ruling on the SEC's petition.

A litigant cannot sit on a claim of privilege, allow a court to rule, and seek to assert a privilege

when the court's ruling goes against him.   Because Liberty was aware of the materials in the

SEC's possession but did not file any motion to restrict the use of those materials or otherwise

challenge the SEC's alleged misconduct until after my ruling, I conclude that Liberty's challenge

is untimely and does not raise the extraordinary, equitable circumstances that must ground a Rule

60(b) motion.

Second, I conclude that Liberty is unable to establish misconduct on the part of the SEC

by clear and convincing evidence.  Rather, Liberty's allegations rest almost entirely on a series of

---

[4] Liberty protests that he could not identify specific documents produced by Stanley until January 12, 2022, when the SEC sent a letter providing a secure link to 713 documents which the SEC had segregated based on Stanley's representation that the documents may be privileged. *See* Liberty Br. at 15; Liberty Reply at 3.  While Liberty may not have had direct access to the segregated documents until January 2022 when a link was supplied, the 2013 cover letter from Stanley's attorneys forwarding the documents was itself produced in June 2021 in the Maine litigation.  As of that point, Liberty indisputably had notice of them. *See* SEC Letter of Feb. 4, 2022, Ex. J to Liberty's Br., ECF 182.  Moreover, the 713 segregated documents were all documents which Liberty himself had originally produced to Stanley in arbitration. Necessarily, he was aware of them and had full access to them if necessary to his defense.  One view of the correspondence between counsel was that Liberty deliberately prolonged efforts to address issues of privilege following the June production, as the SEC letters reflect that they made multiple offers to provide the 713 segregated documents to which they received no response.

The rest of the documents over which Liberty is asserting privilege in the Maine litigation were produced on June 16, 2021. Liberty's Motion for Protective Order, No. 18-139, ECF 137, at 6 (D. Maine Dec. 7, 2021).  Thus, to the extent that Liberty is alleging misconduct on the part of the SEC related to the 1,300 other documents, June 2021 would be the pertinent date to assess the timeliness of his objections.

uncharitable inferences against the SEC supported only by assertions made in the course of a discovery dispute. The SEC has repeatedly represented that those 713 documents were never reviewed by or in the possession of litigators in either this litigation or the Maine litigation. *See* SEC Letter of Jan. 12, 2022, Ex. F to Liberty's Br., ECF 182 ("As we have previously informed you, the possibly privileged materials from Mr. Stanley were immediately segregated upon receipt by the SEC's IT personnel.  The investigation and trial teams have never had access to these documents from Mr. Stanley.").  Besides a lack of evidentiary support, Liberty's line of argument is itself ambiguous and self-contradictory.  At times Liberty suggests that the SEC's misconduct was its purported review of 713 documents that the SEC sequestered because of representations by Stanley's counsel that they might be privileged.  Liberty Br. at 8.  At other times, Liberty more generally refers to the SEC's potential review of all 2,000 documents, including both the 713 sequestered documents and the 1,300 documents over which Liberty *later* asserted privilege.[5] Liberty Reply at 3.  Yet Liberty's only "proof" of misconduct on that score is that some of the documents in dispute may overlap with certain topics discussed at Stanley's deposition. Liberty Br. at 9; Liberty Reply at 2.  But inquiry into Liberty's assets is not a "privileged" topic on its own,[6] nor in the absence of more than insinuations and conjecture does the SEC's investigation

---

[5] This lack of specificity may serve a strategic purpose.  Based upon the correspondence between the parties that Liberty attaches, at least 1,000 of the 1,300 documents over which Liberty asserted privilege in the Maine litigation were of a type specifically ruled on as non-privileged by the arbitrator in the matter between Liberty and Stanley.  *See* SEC Letter of March 8, 2022, Ex. M to Liberty's Br. The other 300 documents appear to have originally been produced by Stanley to Liberty, and it was Liberty's burden in the arbitration in 2013 to produce a privilege log as to them.  *Id.*  None of these documents are before the me in a form that would permit me to determine relevance, whether Liberty ever properly asserted privilege over them through a privilege log, or whether in the final analysis a privilege actually applies. That is certainly Liberty's burden, particularly when the controlling standard is clear and convincing evidence.

[6] Indeed, to the extent that Liberty is implicitly suggesting that attorney involvement with his submissions to FTI gives rise to a privilege, he is treading on shaky ground.  Were such communications to evidence an intent to mislead FTI and thereby mislead the SEC, the crime-fraud exception would certainly become relevant. *See In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011) ("[I]n situations where the client consults the attorney for the purpose of committing a future crime or fraud, the crime-fraud

into Liberty's contempt raise even a specter of misconduct.  That is particularly the case given the myriad of other non-privileged sources from which it may have been initiated, including Stanley's own direct testimony about personal instructions from Liberty to intentionally mislead FTI.

I also note that the SEC's March 8 letter in the Maine litigation's privilege dispute, following a day after the entry of the order here, supports no further inference of misconduct.  That four-page letter was a timely response to a February 28 letter from Liberty's counsel and appears to represent the SEC's good faith efforts to narrow the scope and refine the parameters of the privilege dispute.  SEC Letter of Mar. 8, 2022, Ex. M to Liberty's Br.  Liberty's February 28 letter attached for the first time the arbitration agreement that Liberty relied on for the basis of his privilege over the contested documents.  Mina Letter of Feb. 28, 2022, Ex. L to Liberty's Br.  But fatal to the inference that Liberty would like the Court to draw here, the SEC's letter contests Liberty's assertions of privilege, even with the arbitration agreement in hand, and requests further evidence from Liberty to support his claims.  While the SEC agreed as a matter of good faith and professional courtesy to *continue* treating the documents as privileged pending resolution of the dispute—and thus the March 8 letter does not even show a change in the SEC's posture—it is abundantly clear from the record in the case that the SEC did not and has not stood down on its challenges to Liberty's privilege assertions over the Stanley documents.  Most notably, this is shown by the fact that the Maine court held a hearing on the privilege motion two weeks later and issued an order for the SEC to implement a filtration team to review the documents.  Procedural Order, No. 18-cv-139, ECF 151 (D. Maine Mar. 23, 2022).  The parties continue to litigate over the procedure to be followed in the filtration team's review.

---

exception to the attorney-client privilege applies and communications made in furtherance of the anticipated crime or fraud are not protected from disclosure as recognition of the privilege is no longer defensible.").

Third, I conclude that Liberty is unable to establish by clear and convincing evidence that he was frustrated in his ability to fully and fairly litigate his defense due to the SEC's purported misconduct.  This conclusion follows naturally from the fact that Liberty cannot point to any ostensibly privileged document or other evidence forming the basis for my finding of contempt despite his early knowledge of Stanley's deposition.  Nor does he explain how the SEC's use of privileged materials would have impacted his ability to establish that he had not in fact misrepresented his assets.  As previously discussed, the one place where Liberty attempts to draw a causal link between the alleged misconduct and his ability to defend himself was in his brief responding to the contempt petition. Supplemental Brief, ECF 173.  There he argued that the principal impact of the SEC's alleged misconduct was to "trap Mr. Liberty in a Catch-22" of contradictory positions as to the nature of funds solicited on behalf of Mozido.  ECF 173 at 13.[7] Yet the Court's contempt opinion does not rely on misrepresentations concerning Mozido or Liberty's finances relative to Mozido, but cites Mozido only as part of Liberty's *modus operandi* of making dubious assertions to suit his purposes in the moment, in disregard of the truth.[8]  The

---

[7] The relevant passage from Liberty's brief on the contempt petition in full reads:

Using this privileged information, the SEC concocted two different stories about Mr. Liberty's financial condition: 1) the one it has told this Court, namely that the flow of loan proceeds through Xanadu and Mozido's $100 million valuation evidenced Mr. Liberty's ability to pay full disgorgement, *see, e.g.*, Dkt. 144 ¶¶ 7, 25, 30, 34 (SEC's Proposed Findings of Fact & Conclusions of Law); and 2) the story the SEC told in the District of Maine, the one where it claims that all funds flowing through Xanadu were not Mr. Liberty's and instead were intended for Mozido, a company the SEC claimed was virtually worthless. *See* Ex. 22 ¶¶ 1-7, 48. Neither story, of course, is true. Nevertheless, the SEC should not be heard to argue now that *it* was misled after the agency improperly obtained privileged materials from Mr. Stanley and then set forth two diametrically opposed sets of allegations in an effort to trap Mr. Liberty in a Catch-22.

[8] Specifically, Mozido was discussed to point out that Liberty made wildly divergent statements to potential investors about the value of Mozido and the size of his stake in it.  The Court took no position on whether Mozido's value at that time was actually $0, $100 million, or $700 million, or what the size of Liberty's stake in it actually was.

core of the contempt opinion was Liberty's intentional efforts to mislead the SEC about the nature and value of Xanadu and its predecessor BHIP.  ECF 180 at 16-23.  Thus, even Liberty's own characterizations of the alleged misconduct fail to identify a causal link between the SEC's putative actions and his ability to litigate the present action.

Having determined that Liberty is not entitled to relief under Rule 60(b)(3), I also conclude that he is not entitled to relief under Rule 60(b)(6). The same equitable factors such as timeliness and prejudice apply, and the Third Circuit has emphasized that a party invoking Rule 60(b)(6) must identify "extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Sawka v. Healtheast, Inc.*, 989 F.2d 138, 149 (3d Cir. 1993). "This requirement exists in order to balance the broad language of Rule 60(b)(6), which allows courts to set aside judgments for 'any' reason justifying relief, with the interest in the finality of judgments." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir. 2008)

There is nothing extreme about the relief granted to the SEC given the record in this case. There is nothing unexpected about the situation in which Mr. Liberty finds himself, either as to the process that has brought us to this point or the outcome.  As to process, Liberty has had ample opportunity to assert claims of privilege.  As to outcome, the finding of contempt followed directly from Defendant's conduct. In no respect does this case qualify for the extraordinary remedy recognized by Rule 60.

## IV.    <u>Conclusion</u>

For the reasons set forth above, Defendant Liberty's motion is denied.


/s/ Gerald Austin McHugh
United States District Judge

11